# SOUTHERN RAILWAY COMPANY v. CARNEGIE STEEL COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 8.    Argued October 13, 14, 1898. — Decided January 29, 1900.

In a decree for the foreclosure and sale of a railroad property under a mortgage, power was reserved by the court to compel the purchaser to pay any and all receivers' debts or claims adjudged or to be adjudged as prior in lien or equity to the mortgage debts or entitled to preference in payment out of the proceeds of sale. *Held*, That the rights of creditors whose claims had been filed were not affected by the sale of the property or by the fact of its transfer to the purchaser; nor did the reservation in the order of sale prevent the purchaser from contesting upon their merits any claims allowed after the purchase under the decree of sale.

A railroad mortgagee when accepting his security impliedly agrees that the current debts of a railroad company contracted in the ordinary course of its business shall be paid out of current receipts before he has any claim upon such income; that, within this rule, a debt not contracted upon the personal credit of the company, but in order to keep the railroad itself in condition to be used with reasonable safety for the transportation of persons and property, and with the expectation of the parties that it was to be met out of the current receipts of the company, may be treated as a current debt; that whether the debt was contracted upon the personal credit of the company, without any reference to its receipts, is to be determined in each case by the amount of the debt, the time and terms of payment, and all other circumstances attending the transaction; and that when current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the funds thus improperly diverted from their primary use.

A general, unsecured creditor of an insolvent railroad corporation in the
hands of a receiver is not entitled to priority over mortgage creditors in
the distribution of net earnings simply because that which he furnished
to the company prior to the appointment of the receiver was for the
preservation of the property and the benefit of the mortgage securities.
Before such a creditor is accorded a preference over mortgage creditors
in the distribution of net earnings in the hands of a receiver of a railroad
company, it should reasonably appear, from all the circumstances, that
the debt was one to be fairly regarded as part of the operating expenses
of the railroad incurred in the ordinary course of business and to be met
out of current receipts.

THIS case is here upon a writ of certiorari for the review of
a final decree of the United States Circuit Court of Appeals
for the Fourth Circuit allowing certain claims of the Carnegie
Steel Company, Limited, as preferential debts chargeable upon
current receipts arising from the operation of certain railroad
properties in the hands of receivers.

On the 15th day of June, 1892, William P. Clyde, John C.
Maben and William H. Goadby, citizens of New York, suing
for themselves and other creditors and stockholders of the
Richmond and Danville Railroad Company and of other de-
fendant corporations, exhibited in the Circuit Court of the
United States for the Eastern District of Virginia a bill of
complaint against the Richmond and Danville Railroad Com-
pany and the Richmond and West Point Terminal Railway
and Warehouse Company, Virginia corporations. The bill
made the following case :

The Richmond and Danville Railroad Company (hereafter
called the Danville Company), in addition to its own line
extending from Richmond to Danville, with a twelve-mile
branch, being 152 miles of road, through the purchase or
the acquisition of stock, or by written lease or operating
contracts, obtained the possession and control of more than
twenty other railways built under the respective charters of
and owned by the corporations named in the bill. It also
owned the entire capital stock of the Baltimore, Chesapeake
and Richmond Steamboat Company, and through it operated
a line of steamers between Richmond, West Point and Balti-
more. Its authorized and outstanding capital stock was five

million dollars, the larger part being owned by its codefendant company.

The lines of railway comprising this system, known as the Danville system, were in Virginia, North Carolina, South Carolina, Georgia, Alabama and Mississippi, and reached many of the most important trade centres of those States.

For more than five years prior to the institution of that suit the Danville Company had held in possession and substantial control all the railways of the other companies in connection with its own road as a single system. Over a large portion of the mileage the engines and cars in traffic service were used without any fixed apportionment thereof to any specific portion of the system, and the income derived from the operations of the parent and auxiliary leased and operated lines were received and distributed through a common treasury with no separation of the earnings and expenses of the several properties, except by entries in books of account apportioning the gross income and expenses on some approximate but arbitrary basis of division as between the different lines over which the traffic yielding the revenue had passed.

The total mileage of the auxiliary portion of the Danville railroad, added to its own mileage, aggregated 3320 miles, exclusive of its steamer service.

The aggregate outstanding capital stock of the lines constituting the system, together with the stock of the steamboat company, amounted to $43,482,950, of which $10,707,354 was neither owned nor controlled by the defendant companies.

Through the ownership of all or a majority of the stock thereof, some of the roads were operated by the Danville Company as proprietary lines. Others were operated upon the basis of a fixed rental or payment of net earnings, or a guarantee of interest on bonds or dividends of stock, or both.

In consequence of the absorption of such roads in its system by lease or contract, the bonded debts and rental obligations which the Danville Company had assumed and became liable for amounted to $71,128,126. Its own direct bonded debt was $16,136,000, making the total bonded and rental debt of the Danville system $87,314,126.

The bonded debt resting on the Danville road proper and equipments was in five separate issues of securities; that resting on its auxiliary and operative lines was embraced in fifty-nine different classes of securities issued by the several companies, secured by separate mortgages or deeds of trust covering different sections of the controlled roads or their equipment, capable of separate default or foreclosure, besides five stock guarantees, representing certain of its rental obligations, also secured by provisions for reëntry on default.

The Danville Company also had outstanding car trust obligations of its own and leased lines amounting to $1,542,824, and a floating debt of over $5,000,000; also an emergency loan of $600,000, advanced by those interested in the property to prevent default on April 1, 1892.

Besides all such outstanding fixed liabilities on account of its own road and controlled lines, the directors of the Danville Company had pledged its credit and subjected it to other heavy liabilities, to enable its codefendant, the Richmond and West Point Terminal Railway and Warehouse Company — to be hereafter referred to as the Terminal Company — or certain of its controlled companies to acquire the stock control of other lines of railroads not directly connected with or operated by the Danville Company and in which it had no interest whatever. Its board of directors had issued $6,000,000 of bonds of the Danville Company, executed jointly and severally with the East Tennessee, Virginia and Georgia Company, and guaranteed by the Terminal Company "Cincinnati Extension Bonds," which were secured by a trust pledge of preference and ordinary shares of the Alabama and Great Southern Railway Company, Limited. Those bonds had been sold in open market, and apparently constituted an outstanding liability of the Danville Company, but for which it received no valuable consideration whatever. It had executed the same as mere accommodation paper and as a partnership adventure, and was only protected against loss by the above pledge of corporate stock of uncertain value, because it was subject to heavy prior mortgage debts, and the line of road of the particular corporation issuing such stock was a

central link in the system of the East Tennessee Railway system over which the Danville Company had no control whatever.

By reason of the absolute stock control which the Terminal Company had over the Danville Company it compelled the latter company about June 1, 1891, to become the assignee and guarantor of a written lease executed by the Central Railroad and Banking Company of Georgia, of all its system of railroads and steamer lines for a long term of years to the Georgia Pacific Railway Company, whereby the Danville Company became bound to operate the Central System and to assume and pay all the interest on the bonded debts and all the rental obligations of the Central Railroad and Banking Company; and the Danville Company was compelled to execute and deliver a bond of $1,000,000 to faithfully perform all the covenants in such lease. The result of the operation of the Central-Georgia system of roads had been a constant and heavy loss to the Danville Company.

The bill next set out the relations between the Danville Company and the Terminal Company, and also described what is known as the Tennessee system, having 2318 miles in length of proprietary, leased and operated roads.

It then stated that the five several issues of bonds of the Danville Company were secured by mortgages to divers trustees and constituted liens of varying rank upon some portion of its road, franchises and equipment; that the bonds issued by the Danville and Terminal Companies, as well as a large majority of the several issues of bonds resting on the different separately mortgaged sections of the Danville system, were owned by a large and constantly shifting number of persons and corporations, who were scattered in many different States and countries and had no organization or registration; that what was known as the emergency loan, for which the income of the Danville system was pledged, was advanced in equal sums by a considerable number of persons, many of whom preferred not to have their names or advances disclosed; that the plaintiff, Maben, was a registered stockholder of the Danville Company; that the plaintiffs were

owners of a large amount of the common preferred stock of the Terminal Company and of its six and five per cent bonds, of the Danville Company's debenture and five per cent bonds and of different classes of bonds resting on parts of the Danville system, and some of them were creditors of the Danville Company on account of advances made to the emergency loan, and entitled to the security given therefor; that while nominally distinct corporations, the actual transactions and financial arrangements between the Terminal Company, conducting no active business as a security company, with no assets except stocks and bonds, (but holding nearly the entire capital stock of the Danville Company,) and the Danville Company, as a corporation, operating a large system of railways, separately organized and mortgaged, had resulted in serious complications; that such community of heavy and extra-hazardous liability and hypothecation indissolubly connected the financial operations of the Danville and Terminal Companies, so that the unrelieved embarrassment of either company would necessarily force the insolvency of the other, "and produce a disruption of the system of roads;" that the then financial condition of the two defendant corporations was alarming to the holders of their stocks and bonds; that in the latter part of 1891 the large and increasing floating debts of the several properties in which the Terminal Company was interested and the heavy losses incurred in the operations of some of the roads, created much uneasiness among the stockholders and creditors; that by reason of such condition of things, the management had invited prominent financiers to investigate the several systems and aid in perfecting the best plan for permanently adjusting the affairs of the companies in question and secure them the credit necessary for their successful operation; that two movements to that end had failed, when about the last of May, 1892, "a large number of security holders joined in a request to an eminent banking firm of New York City that it should investigate the property and its financial condition, and undertake to rescue it from the bankruptcy, shrinkage in value and disruption with which the system was threatened;" that such bankers consented to cause an exami-

nation to be made, and the plaintiffs were advised that the same was in progress, but that no conclusion had been reached or report made, and necessarily the creditors and security holders were so numerous, scattered and unknown, and the classes of liens so varied in character and value, that to perfect·any satisfactory plan to reorganize the system and secure the necessary creditors' assent would require considerable time; and that in the meantime the financial embarrassments continued to be urgent and threatening, and the possible consequence thereof might "result in the disruption of the system, and the depreciation of millions of dollars in the value of the securities."

The bill further alleged that the enormous floating debt of the Danville Company was wholly beyond its financial ability to carry out of its ordinary revenues, over $4,500,000 of such debt standing in demand loans subject to summary enforcement; that by reason of the depreciation in the market value of its securities, and the failure of the several efforts to reorganize the property, its credit had been much impaired; it was not able to pay its obligations as they matured, but had been forced to ask renewals; it had no available collaterals to enable it to negotiate such a loan as was necessary to adequately protect it against open default; it had been forced to postpone payment of usual operating expense vouchers for supplies, and was allowing heavy arrears of such debts to accrue; many creditors had brought suits and attached cars and funds forwarded to pay employés; besides its floating debt, mortgage coupons on seventeen sectional mortgages, aggregating $989,000, would fall due on July 1; 1892; it had no available money or assets wherewith to pay the debts which would soon mature and no reasonable hope of financial assistance from any quarter to enable it to do so; its directors had had no meeting for over two months, and had practically abdicated their trust and power of management and confessed their utter inability to devise means to divert the insolvency and disruption of the system in their charge.

Plaintiffs charged that the corporation was insolvent and

this vast trust property was substantially derelict; that the unity of the property, as held and operated as an important trunk line, constituted one of the most important ingredients of its value, and that to permit its severance would result in a ruinous sacrifice to every interest in the property; that the owned and operated lines of road lie in six States, and were subject to the jurisdiction of the courts in each of the many counties in which the property was situate; that unless the court, in view of the impending and inevitable defaults as aforesaid, would deal with the property as a single trust fund, and take it into judicial custody for the protection of every interest therein, individual creditors, immediately upon default, would assert their remedies in different courts in the several States; that a race of diligence would result, and judgments and priorities attempted; that levies and attachments would be laid upon the engines and cars of the company, and upon the fuel, material and supplies indispensable to the operations of the road and which would greatly interfere and ultimately prevent the company from properly discharging its duties as a public carrier, and seriously diminish the earnings of the road; that lessors of the roads now owned would enforce the reëntry covenants of their leases; that the continued default of the mortgaged debts would produce the immediate maturity of the bonds; and that "a vast and unnecessary multiplicity of suits will result, and a most important and valuable trust property will be dismembered by the clashing decrees of the many courts exercising jurisdiction at the suit of separate creditors, which might be shielded and preserved as a valuable single trust property by adequate judicial protection until such time as a satisfactory financial reorganization could be perfected."

The plaintiffs also averred "that the Central Trust Company is not only the trust depository in the said pledge of income, but is the trustee in over twelve trust deeds executed by the Danville Company and divers roads in its system, and also trustee for the preferred stockholders and 6% and 5% trust deeds of the Terminal Company. That the trusts and duties in said different deeds as to property, equipment and income

are variant,· and in some respect antagonistic.   In case of default and judicial enforcement, their reciprocal rights will have to be construed and decreed ·by the court, and such common· trustee cannot properly represent such variant trusts; and the bondholders have the equity to apply in their own names to protect the trust estate."

The relief asked was —

That the court would decree· that the plaintiffs as holders of aliquot portions of the emergency loan to the Danville Company, guaranteed by the Terminal Company, had a fixed and specific lien upon all and singular the income, tolls and revenues of the Danville Company and ,its leased, operated and controlled railroads, and each of them, and that the condition of such pledge of income had been broken, entitling the holders of such indebtedness to enforcement thereof;

That the court would also administer the trust fund in which the plaintiffs were interested, constituting the entire railroad and assets of the defendant corporations, and would for that purpose marshal all their assets and ascertain the respective liens .and priorities existing upon every part of such system of railways, the amount due upon mortgages and other liens, and enforce and decree the rights, liens and ·equities of each and all of the stockholders and creditors of the Danville and Terminal Companies as the same were finally ascertained and decreed, in and to not only those lines of railroads, appurtenances and equipments, but also to and upon every portion of the assets and property of each of those corporations ; and

That for the purpose of enforcing a lien and equity upon the income of the railroad system aforesaid, ·to which the holders of the emergency loan were by contract entitled, " as well as to preserve the unity of said system," as it had been for years maintained and operated, and preventing the disruption thereof by separate executions, attachments or sequestrations, the occurrence of which would be inevitable in view of the defaults in interest payments which would presently occur, the court would forthwith appoint one or· more receivers of the entire system of railroads and steamers · held and operated by the Danville Company, together. with all equip-

ment, material, machinery, supplies, moneys, accounts, choses
in action and assets of every description and wherever situated,
together with all leasehold rights and contracts, with author-
ity to manage and operate the same as the officers of and
under the direction of the court, and that all the officers,
managers, superintendents and employés of the Danville Com-
pany be required to forthwith deliver up the possession of all
and singular each and every part of the property, over which
the receivers were thus appointed, wherever situate, and also
all books of accounts, offices, vouchers and papers in any way
relating to the business or operation of such system of rail-
ways and steamers, and for injunctions restraining each and
every of the officers, directors, managers, superintendents,
agents and employés of the Danville Company from interfer-
ing in any way whatever with the possession and control of
the receivers over any part of the property.

Upon hearing and considering the bill, with the exhibits
and answer in support thereof, and on motion of the com-
plainants, Frederic W. Huidekoper and Reuben Foster were
appointed by the court receivers of the property and assets
of the Danville Company, namely, the system of railways then
in the possession of and owned and controlled by that corpo-
ration, situated in the District of Columbia and in the States
of Virginia, North and South Carolina, Georgia, Alabama
and Mississippi, together with all the equipment, shops, appur-
tenances of every kind, machinery, material and supplies
owned, held or in the possession and use of such corporation,
wherever situate, including all tracks, terminal facilities, real
estate, warehouses, offices, stations and all other buildings of
every kind, owned, held or possessed by the Danville Com-
pany, together with all steamers, wharves and other proper-
ties held in connection therewith, and all moneys, choses in
action, credits, bonds, stocks, leasehold interests or operating
contracts, and other assets of every kind, and all other prop-
erty, real, personal and mixed, owned, held or possessed by
that company.

It was further provided in the order of the court that the
receivers " shall, from time to time, out of the funds coming

into their hands from the operation of the property, pay the expense of operating the same and executing their trusts, and all taxes and assessments upon the said property or any part thereof, and also pay and discharge all such traffic and car mileage balances as may be due to connecting and other railways, and all such loss and damage claims arising from the previous operation of said property as, in their judgment, on examination, are proper to be paid as expenses of operation; and shall also, out of the moneys coming into their hands, pay and discharge all the current unpaid pay rolls and vouchers and supply accounts incurred in the operations of said railroad system, at any time within six months prior hereto."

The receivers, who are referred to in the record as the insolvency receivers, entered into full and exclusive possession on the 16th day of June, 1892.

On that and the succeeding day auxiliary suits were instituted by the plaintiffs against the Danville Company in the Circuit Courts of the United States for the Western District of North Carolina, the District of South Carolina, the Northern District of Georgia, the Northern District of Alabama and the Northern District of Mississippi, and orders were duly entered of record by each of those courts confirming the original appointment of receivers and recognizing the Circuit Court of the Eastern District of Virginia as having primary jurisdiction over all the railroad system and property of the Danville Company wherever situated.

On the 28th day of June, 1892, the plaintiffs filed a petition in the cause, stating that the Central Trust Company of New York was trustee in five mortgages executed by the Danville Company, resting upon its property, and of the following dates and amounts: October 5, 1874, $5,997,000; February 1, 1882, $3,368,000; October 22, 1886, $4,498,000; September 3, 1889, $1,390,000; May 1, 1891, $883,000. The petitioners prayed that the receivers be authorized to execute and sell receivers' certificates to an amount not exceeding $1,000,000, which should be a first lien on the Richmond and Danville Railroad, its property, leasehold interests, contracts and income, "and out of the proceeds, as a special fund, to pay and

discharge all outstanding indebtedness of the Danville Company incurred for material and supplies in the operation of the roads in the receivers' hands, which were purchased within six months prior to June 15, 1892, as the said indebtedness shall be ascertained and reported on by special masters to be appointed for such purpose; and also, that out of the funds coming into their hands from the operation of the roads which could be safely used without prejudice to their own current liabilities for operating expenses, the receivers be authorized to pay the instalments of rent and coupons of mortgage bonds resting " upon the several parts of the system, so as to protect and preserve the present unity of the system of roads in their charge." The petition concluded : " The Central Trust Company is the trustee in each and all of the trust deeds and mortgages, and it is made a party hereto, so that it can appear to the application and be heard upon the question of using receivers' certificates, and authorizing the payment of mortgage, interest and rental obligations out of the current net income of the receivership."

Of the application for an order in accordance with the petition, the defendants and the Central Trust Company had notice. The court by order authorized the borrowing of $1,000,000 receiver's certificates to be used for the purposes indicated in the petition. The Trust Company was represented at the hearing of the application; and so far as the record discloses, made no objection to the order.

On the 13th day of July, 1892, the Central Trust Company presented its petition and prayed that it be allowed to intervene in the suit brought by Clyde and others for the protection of the holders of the six per cent bonds of the Danville Company and of the subscribers to the emergency loan made prior to April 1, 1892, and in respect of which that company was the trust depositary of the income of the Danville system pledged to secure such loan ; and by order entered August 16, 1892, leave was given for that company to intervene in the cause, " on the condition that it hereby submits to the several orders heretofore entered herein." On the latter day that company presented its petition, asking that Huide-

koper and Foster be appointed as permanent receivers of the Danville Company, if the court should determine to continue its judicial possession of the system. An order to that effect was accordingly made. In presenting the above petition the Central Trust Company appeared not only as trustee of the Richmond and Danville Railroad Company and the consolidated gold mortgage to be presently referred to, but as trustee representing other mortgages and railroads, including the Virginia Midland Railroad, the Georgia Pacific Railway, and the North Eastern Railroad of Georgia.

On the 19th day of December, 1892, an intervening petition was presented by parties representing the underlying bondholders interested in any litigation or proceedings for the foreclosure of any of the mortgage or trust deeds of the Danville Company or any of the companies forming a part of the Danville system, and they were permitted to become parties complainant in the Clyde suit and to file such petitions and take such proceedings as they deemed necessary or requisite for the protection.of the interests they represented.

In the suit instituted by Clyde and others, the Carnegie Steel Company, Limited, filed with the Master Commissioner, October 14, 1892, its claims arising out of certain contracts made between that company and the Danville Railroad Company in 1891 for steel rails delivered to the latter between July 25, 1891, and October 10, 1891. The facts relating to those contracts will be hereafter stated.

On the 13th day of April, 1894, the Central Trust Company of New York instituted a separate suit against the Richmond and Danville Railroad Company for the foreclosure of what is known as the consolidated gold mortgage. Upon the filing of that petition, and on the motion of the Trust Company, an order was entered appointing Huidekoper, Foster and Spencer receivers of the court of all and singular the railroads, property, assets, credits and effects of the Richmond and Danville Railroad Company, "the same being the system of railways owned, operated or controlled by the said corporation, situate in the District of Columbia and in the States of Virginia, North Carolina, South Carolina, Georgia, Alabama and Mis-

sissippi, together with all the equipment, shops," etc., " and other assets of every kind, and all other property, real, personal and mixed, held or possessed by the said railroad company, the above-mentioned property being now in the possession, of said Frederic W. Huidekoper and Reuben Foster, receivers duly appointed by this court in a certain suit brought in this court and now pending therein, wherein William P. Clyde and others are plaintiffs and the Richmond and Danville Railroad Company and others are defendants." These receivers are described in the record as the foreclosure receivers.

The order last named contained this clause :

" Nothing in this order contained shall be construed to vacate any of the orders heretofore entered in the case of William P. Clyde and others; but the court reserves full power to act upon the masters' reports filed in the said cause, and in said cause to adjudge and decree upon the rights of creditors ascertaining [asserting] a claim against the property of the said railroad company or income thereof, in preference to the mortgage debt thereof, by orders to be entered in the said suit of William P. Clyde and others, upon notice to parties, with like effect upon the mortgaged property and income as if such orders were entered in this cause."

The Carnegie Company was permitted to intervene in the suit brought by the Central Trust Company, alleging in its petition that the rails sold and delivered by it to the Danville Company were used upon its roadbed for the purpose of maintaining the same in condition to conduct its traffic thereon and were necessary for that purpose. The claimants referred to the fact that they had previously filed their claim in the Clyde suit, " which claim is now pending in said cause before the masters, the demand of your petitioner that the same shall be allowed as a claim entitled to equitable priority of payment over the mortgage debt of the said defendant not having been heard or considered by said masters."

On the 17th day of February, 1894, the suit instituted by the Central Trust Company of New York and the one brought by Clyde and others were consolidated under the name of " *The Central Trust Company of New York and others* v.

*The Richmond and Danville Railroad Company and others, Consolidated Cause.*"   Upon application of the Carnegie Company it was made a party defendant in the consolidated cause.

A decree of foreclosure and sale in the consolidated cause was entered April 13, 1894, and a sale took place June 15, 1894, the property embraced by the decree being sold as a unit.   Charles H. Coster and Anthony J. Thomas, a purchasing committee, as joint tenants purchased the property for the use, benefit and behoof of a corporation to be organized pursuant to the terms of an act of the General Assembly of Virginia, approved February 20, 1894, entitled "An act authorizing the purchasers of the Richmond and Danville Railroad, their assigns and successors, to become and be a corporation."   The sale was approved by formal order of court and confirmed to the purchasing committee, composed of Coster and Thomas, for the sole use, benefit and behoof of the Southern Railway Company created under the laws of Virginia.

The decree of confirmation contained the following clauses : " And the court accepts the said Southern Railway Company as the purchaser of all and singular the railroad, property and franchises sold under this decree, and holds it as such purchaser obligated to complete and fully to pay the said bid and comply with all the orders of the court already entered, and hereafter, from time to time, to be entered by it obligatory on such purchaser.   And the court further reserves full power from time to time to enter orders binding upon the said Southern Railway Company as such purchaser, requiring it to pay into the registry of the court all such sums as have been or may be ordered by the court for the payment of any and all receivers' debts or claims adjudged or to be adjudged as prior in lien or equity to the mortgage herein foreclosed, or entitled to preference in payment out of the proceeds of sale."   That order also contained this clause : " The court reserves full power notwithstanding such conveyance and delivery of possession to retake and resell the property this day confirmed to such purchaser if it fails or neglects fully to complete such

purchase and comply with the orders of court in respect to full compliance therewith, or to pay into court, in accordance with such decree of sale and orders of court, all sums of money hereafter ordered by the court to be paid into its registry to discharge any and all such debts, liens or claims as it may decree ought to be paid out of the proceeds of sale in preference to the mortgage herein foreclosed."

Subsequently, upon hearing of the exceptions to the masters' report on the claim of the Carnegie Steel Company, Limited, the Circuit Court found that that company furnished to the railroad company, at the dates and in the quantities named in their petition for claim, steel rails to the aggregate value of $125,067.39, which the company used and agreed to pay for, and that the interest on that amount was $29,828.58; in all, $154,895.97. It further found that that sum had never been paid by the railroad company; that "the earnings of said defendant railroad company, which should have been used for the payment of current expenses, including therein this claim, have been used for the benefit of mortgage creditors, in a sum more than sufficient to pay said claim in full;" and that "prior to May 1, 1888, bonds of the Richmond and Danville Railroad Company known as consolidated bonds were issued to the amount of $1,621,000, and that since that date such bonds have been issued to the amount of $2,906,000." And it was adjudged that the claim, with interest thereon from the time when the respective items thereof became due and payable by the Danville Company, was entitled to priority of payment out of the funds resulting from the sale of the mortgaged property, over the bonds secured by the mortgage foreclosed by the decree heretofore passed in this cause, and was also entitled by reason also of the statutes of Virginia "to priority of payment out of the fund resulting from the sale of the mortgaged property, over such of the bonds secured by the mortgage foreclosed by the decree heretofore passed in this cause as were issued after May 1, 1888, being $2,906,000 in amount." It was further ordered that "the purchaser at the sale heretofore made, or his assigns, do forthwith pay to the Carnegie Steel Company, Limited, said sum of $154,895.97, in

compliance with the terms of the decree of sale heretofore passed, whereby the purchaser at such sale, or his assigns, was required to pay off and satisfy all claims filed in this cause, which this court should adjudge prior to the mortgage by said decree foreclosed."

The Southern Railway Company prosecuted an appeal from that order to the Circuit Court of Appeals, and the action of the Circuit Court was approved. 42 U. S. App. 145; 76 Fed. Rep. 492. The case is in this court upon certiorari, sued out by the railway company.

*Mr. Henry Crawford* and *Mr. Edward J. Phelps* for appellant. *Mr. Willis B. Smith* was on their brief.

*Mr. Nicholas P. Bond* and *Mr. David Willcox* for appellees. *Mr. P. C. Knox* was on their brief.

MR. JUSTICE HARLAN, after stating the facts as above, delivered the opinion of the court.

It appears from the above statement that the property in the hands of the receivers in the Clyde or insolvency suit was surrendered to the receivers in the foreclosure suit under an order that expressly reserved power in the court to adjudge and decree in the Clyde suit upon the rights of creditors asserting claims against the property of the railroad company or its income in preference to mortgage debts. Besides, the decree of sale provided that the purchaser or purchasers, or his or their assigns, under any decretal sale should, as a part of the consideration, in addition to any sum bid, take the property upon the express condition that he or they would pay and satisfy (among other specified claims) all claims theretofore " filed in this case or in either of the causes consolidated herein, but only when said court shall allow such claims and adjudge the same to be prior in lien or superior in equity to the mortgage foreclosed in this suit, and in accordance with the order or orders of the court allowing such claims and adjudging with respect thereto." And the right was dis-

tinctly reserved to retake and resell the property in case the purchaser or purchasers, or his or their assigns, failed ,or neglected to comply with the order of court in respect of the payment of such prior liens. These conditions were repeated in the order confirming the sale. So that the right of the Carnegie Company to have its claims determined upon their merits is not at all affected by the sale of the property held by the receivers in the consolidated cause, or by the fact of its transfer to the Southern Railway Company. And we add that the above reservation in the orders and decree of the Circuit Court left it open for the Southern Railway Company to contest, upon their merits, any claims allowed after its purchase under the decree of sale.

The respective rights of the mortgagees of a railroad company and of parties having claims against it at the time its property passed into the hands of receivers have been frequently the subject of consideration by this court. But as counsel differ as to the scope and effect of former decisions, it is necessary to examine them and ascertain whether those decisions embrace the case now before the court.

The leading case is *Fosdick* v. *Schall*, 99 U. S. 235, 252, 253, which related to a claim against a railroad company for rent of cars. In that case Chief Justice Waite delivered the unanimous judgment of the court. After observing that the business of all railroad companies was done to a greater or less extent on credit, and that this credit was longer or shorter as the necessities of the case required said : " The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income. If for the convenience of the moment something is taken from what may not improperly be called the current debt fund, and put into that which belongs to the mortgage creditors, it certainly is not inequitable for the court, when asked by the

mortgagees to take possession of the future income and hold it for their benefit, to require as a condition of such an order that what is due from the earnings to the current debt shall be paid by the court from the future current receipts before anything derived from that source goes to the mortgagees. In this way the court will only do what, if a receiver should not be appointed, the company ought itself to do. For even though the mortgage may in terms give a lien upon the profits and income, until possession of the mortgaged premises is actually taken or something equivalent done, the whole earnings belong to the company and are subject to its control." The court further said: " The mortgagee has his strict rights which he may enforce in the ordinary way. If he asks no favors he need grant none. But if he calls upon a court of chancery to put forth its extraordinary powers and grant him purely equitable relief, he may with propriety be required to submit to the operation of a rule which applies in such cases, and do equity in order to get equity. The appointment of a receiver is not a matter of strict right. Such an application calls for the exercise of judicial discretion; and the chancellor should so mould his order that while favoring one injustice is not done to another. If this cannot be accomplished the application should ordinarily be denied. We think also that if no such order is made when the receiver is appointed, and it appears in the progress of the cause that bonded interest has been paid, additional equipment provided, or lasting and valuable improvements made out of earnings which ought in equity to have been employed to keep down debts for labor, supplies and the like, it is within the power of the court to use the income from the receivership to discharge obligations which, but for the diversion of funds, would have been paid in the ordinary course of business. This, not because the creditors to whom such debts are due have in law a lien upon the mortgaged property or the income, but because, in a sense, the officers of the company are trustees of the earnings for the benefit of the different classes of creditors and stockholders; and if they give to one class of creditors that which properly belongs to another, the

court may, upon an adjustment of the accounts, so use the income which comes into its own hands as, if practicable, to restore the parties to their original equitable rights. While, ordinarily, this power is confined to the appropriation of the income of the receivership and the proceeds of moneyed assets that have been taken from the company, cases may arise where equity will require the use of the proceeds of the sale of the mortgaged property in the same way. . . . No fixed and inflexible rule can be laid down for the government of the courts in all cases. Each case will necessarily have its own peculiarities, which must to a greater or less extent influence the chancellor when he comes to act. The power rests upon the fact that in the administration of the affairs of the company the mortgage creditors have got possession of that which in equity belonged to the whole or a part of the general creditors. Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably obtained. It follows that if there has been in reality no diversion, there can be no restoration; and that the amount of the restoration should be made to depend upon the amount of the diversion. If in the exercise of this power errors are committed, they, like others, are open to correction on appeal. All depends upon a proper application of well-settled rules of equity jurisprudence to the facts of the case, as established by the evidence."

In *Hale* v. *Frost*, 99 U. S. 389, it appeared that a receiver was appointed in a suit brought by trustees to foreclose mortgages executed by a railroad company. He was appointed May 19, 1875, at which time the company owed employés for back wages and was indebted for current supplies. To the Union Car Spring Manufacturing Company it was indebted for springs and spirals furnished in March and April before the appointment of the receiver, and which he continued to use. It was also indebted to Hale, Ayer & Co. for supplies to the machinery department and for materials for construction purposes; and on the 13th day of February, 1873, a given amount was due them, as evidenced by the notes of the railroad company falling due on that day. The judges who

heard the case in the court of original jurisdiction were divided in opinion on the following points made by intervening creditors: 1. That the railway mortgage was a prior lien only upon the net earnings of the road, after the payment of all the operating expenses, while the road was in the possession of the company. 2. That after the default in the payment of the interest November 1, 1873, the fact that the mortgagees funded their coupons and left the company in possession of the road constituted the company their agent and trustee in equity, and they were estopped from objecting to the payment from the earnings of the road of all legitimate debts contracted by the company for operating expenses. 3. That the net earnings of the road, while in the possession of the court and operated by its receiver, were not necessarily and exclusively the property of the mortgagees, but were subject to the disposal of the chancellor in the payment of claims which had superior equities, if such should be found to exist, and that the intervening petitioners' claims had superior equities to those of the mortgagees. The petitions were dismissed and the intervenors appealed. This court, speaking by Chief Justice Waite, said: "The first question certified in this case is answered in the affirmative, upon the authority of *Fosdick* v. *Schall*. The third question is answered in the same way upon the same authority. The Union Car Spring Manufacturing Company is entitled to payment in full, and Hale, Ayer & Co. to payment of so much of their claim only as is for supplies to the machinery department. There is nothing in the case to show any special equities in their favor in respect to that part of their account which is for material for construction purposes. An answer to the second question is unnecessary."

In *Burnham* v. *Bowen*, 111 U. S. 776, 780, 783, it appeared that the trustees of a mortgage covering all the property of a railroad company and all the revenues and income thereof, brought suit to foreclose the mortgage and had a receiver appointed. In the order appointing the receiver no special provision was made for the payment of debts owing for current expenses. When the receiver took possession the rail-

road company was indebted for coal used on locomotives — a debt contracted by the company in the ordinary course of a continuing business, and which would have been paid out of current earnings at the time agreed on if the company had remained in possession. The debt due the coal company was evidenced by the acceptances of the railroad company, which were for different amounts, maturing a month apart, thus implying, as this court said, monthly settlements of monthly accounts, with a somewhat extended credit to meet the business requirements of the railroad company. A decree was entered finding the amount due to Bowen, the holder of the acceptances, and declaring that the mortgaged property in the hands of the trustees under the decree of foreclosure was equitably bound for the payment thereof.

Chief Justice Waite, delivering the unanimous judgment of this court, said: "In our opinion the view which the Circuit Court took of this case was the correct one. The company had never paid its bonded interest. From the very beginning it was in default in this particular, yet the mortgage trustees suffered it to keep possession and manage the property. The maintenance of the road and prosecution of its business were essential to the preservation of the security of the bondholders. The business of every railroad company is necessarily done more or less on credit, all parties understanding that current expenses are to be paid out of current earnings. Consequently, it almost always happens that the current income is incumbered to a greater or less extent with current debts made in the prosecution of the business out of which the income is derived. As was said in *Fosdick* v. *Schall*, 99 U. S. 235, 252, 'the income [of a railroad company] out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim on the income.' Such being the case, when a court of chancery, in

enforcing the rights of mortgage creditors, takes possession of a mortgaged railroad and thus deprives the company of the power of receiving any further earnings, it ought to do what the company would have been bound to do if it had remained in possession, that is to say, pay out of what it receives from earnings all the debts which in equity and good conscience, considering the character of the business, are chargeable upon such earnings. In other words, what may properly be termed the debts of the income should be paid from the income before it is applied in any way to the use of the mortgagees. The business of a railroad should be treated by a court of equity under such circumstances as a 'going concern,' not to be embarrassed by any unnecessary interference with the relations of those who are engaged in or affected by it. In the present case, as we have seen, the debt of Bowen was for current expenses and payable out of current earnings. It does not appear from anything in the case that there was any other liability on account of current expenses unprovided for when the receiver took possession, and there is nothing whatever to indicate that this debt would not have been paid at maturity from the earnings if the court had not interfered at the instance of the trustees for the protection of the mortgage creditors."

It was contended in that case that no part of the income, prior to the receiver's appointment, was used to pay mortgage interest or to put permanent improvements on the property, or to increase the equipment, and therefore there was no such diversion of the funds belonging in equity to the labor and supply creditors as to make it proper to use the income of the receivership to pay them. Touching that contention, this court said: "The debt due Bowen was incurred *to keep the road running*, and thus preserve the security of the bond creditors. If the trustees had taken possession under the mortgage, they would have been subjected to similar expenses to do what the company, with their consent and approbation, was doing for them. There is nothing to show that the receiver was appointed because of any misappropriation of the earnings by the company. On the contrary, it is proba-

ble, from the fact that the large judgment for the right of way was obtained about the same time the receiver was appointed, that the change of possession was affected to avoid anticipated embarrassments from that cause. But, however that may be, there certainly is no complaint of a diversion by the company of the current earnings from the payment of the current expenses. So far as anything appears on the record, the failure of the company to pay the debt to Bowen was due alone to the fact that the expenses of running the road and preserving the security of the bondholders were greater than the receipts from the business. Under these circumstances we think the debt was a charge in equity on the continuing income, as well as that which came into the hands of the court after the receiver was appointed as that before. When, therefore, the court took the earnings of the receivership and applied them to the payment of the fixed charges on the railroad structures, thus increasing the security of the bondholders at the expense of the labor and supply creditors, there was such a diversion of what is denominated in *Fosdick* v. *Schall* the 'current debt fund,' as to make it proper to require the mortgagees to pay it back. So far as current expense creditors are concerned, the court should use the income of the receivership in the way the company would have been bound in equity and good conscience to use it if no change in the possession had been made. This rule is in strict accordance with the decision in *Fosdick* v. *Schall*, which we see no reason to modify in any particular."

The opinion in that case thus concluded : "We do not now hold, any more than we did in *Fosdick* v. *Schall* or *Huidekoper* v. *Locomotive Works*, 99 U. S. 258, 260, that the income of a railroad in the hands of a receiver, for the benefit of mortgage creditors who have a lien upon it under their mortgage, can be taken away from them and used to pay the general creditors of the road. All we then decided, and all we now decide, is, that if the current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use."

In *Union Trust Co.* v. *Morrison*, 125 U. S. 591, 609, 612, the contest was between the mortgagees and Morrison who had become surety in a bond given by an insolvent railroad company which was harassed by suits in order to prevent a levy by a sheriff upon its rolling stock. Subsequently a suit was brought to foreclose a mortgage upon the railroad. The giving of the bond undoubtedly protected the company's property from seizure and enabled it to remain a going concern, and saved it to the mortgagees. This court, speaking by Mr. Justice Bradley, said: "Even if it [the rolling stock] would have been subject to the mortgage, when taken on execution, nevertheless it could have been taken,[1] and this would necessarily have disturbed, and perhaps interrupted, the operations of the railroad, by separating the property seized from the corpus of the estate. The trustees of the mortgage might have prevented such a catastrophe, it is true, by filing a bill of foreclosure and for an injunction and receiver; but they did not choose to take this course until nearly three years afterwards; on the contrary, they allowed the railroad company to continue to use the property, and to take care of it for them, and stood by and saw Morrison (who had no interest in the matter) put his hands into the fire and rescue the rolling stock of which they were to receive the benefit — both directly, by receiving the property itself without contest or controversy, and indirectly, by keeping up the railroad as a going concern. Morrison's money, or the fruits of it, has gone into their pockets. And, in this regard, we make no distinction between the mortgagees, the bondholders, whom they represented, the nominal purchasers, Horsey and Canda, or the present company. They were all one and the same in interest. If the property became justly affected by the equity of the petitioner's claim, it remains so affected in the hands of the present company." Referring to prior cases, and dis-

---

[1] The constitution of Illinois of 1870, in which State the case arose, declared, Article XI, § 10, that "the rolling stock and other movable property belonging to any railroad company or corporation in this State shall be considered personal property, and shall be liable to execution and sale in the same manner as the personal property of individuals."

claiming any purpose to modify the rule charging operating expenses upon current earnings, the court said : " The present claim is of a different character, based upon a *bona fide* effort made by the intervenor to preserve the fund itself from waste and spoliation after the mortgage was in arrear and the right to reduce it to possession had accrued. But even here, as we have seen, if the claimant could pursue only the earnings, it is shown that they have been appropriated to the purchase of property which has been added to the fund."

In *St. Louis, Alton &c. Railroad* v. *Cleveland, Columbus &c. Railway*, 125 U. S. 658, 673, the court, speaking by Mr. Justice Matthews, after stating that ordinarily the unsecured debts of an insolvent railroad company cannot take precedence in the distribution of the proceeds of a sale of the property itself over those creditors who are secured by prior and express liens, said : " There are cases, it is true, where, owing to special circumstances, an equity arises in favor of certain classes of creditors of an insolvent railroad corporation otherwise unsecured, by which they are entitled to outrank in priority of payment, even upon a distribution of the proceeds of a sale of the body of the property, those who are secured by prior mortgage liens." "The rule," the court said, "governing in all these cases was stated by Chief Justice Waite in *Burnham* v. *Bowen*, 111 U. S. 776, 783, as follows: ' That if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use.' There has been no departure from this rule in any of the cases cited; it has been adhered to and reaffirmed in them all."

In *Kneeland* v. *American Loan & Trust Co.*, 136 U. S. 89, 97, this court said : " The appointment of a receiver vests in the court no absolute control over the property, and no general authority to displace vested contract liens. Because in a few specified and limited cases this court has declared that unsecured claims were entitled to priority over mortgage debts, an idea seems to have obtained that a court appointing a receiver acquires power to give such preference to any general and

unsecured claims. It has been assumed that a court appointing a receiver could rightfully burden the mortgaged property for the payment of any unsecured indebtedness. Indeed, we are advised that some courts have made the appointment of a receiver conditional upon the payment of all unsecured indebtedness, in preference to the mortgaged liens sought to be enforced. Can anything be conceived which more thoroughly destroys the sacredness of contract obligations? One holding a mortgage debt upon a railroad has the same right to demand and expect of the court respect for his vested and contracted priority as a holder of a mortgage on a farm or lot. So, when a court appoints a receiver of railroad property, it has no right to make that receivership conditional on the payment of other than those few unsecured claims which, by the rulings of this court, have been declared to have an equitable priority. No one is bound to sell to a railroad company or to work for it, and whoever has dealings with a company when property is mortgaged must be assumed to have dealt with it on the faith of its personal responsibility, and not in expectation of subsequently displacing the priority of the mortgage liens. It is the exception, and not the rule, that such priority of liens can be displaced." Again: "It is the exception, and not the rule, that such priority of liens can be displaced. We emphasize this fact of the sacredness of contract liens, for the reason that there seems to be growing an idea that the chancellor, in the exercise of his equitable powers, has unlimited discretion in this matter of the displacement of vested liens." These principles were reaffirmed in *Thomas* v. *Western Car Co.*, 149 U. S. 95, 110, in which it was held that the car company there seeking a preference over mortgage creditors had contracted upon the responsibility of the railroad company, and not in reliance upon the interposition of a court of equity; consequently its claim to a preference was denied.

In *Virginia & Alabama Coal Co.* v. *Central Railroad & Banking Co.*, 170 U. S. 355, 365, 368, the court, referring to the decision in *Burnham* v. *Bowen*, said: "It was thus settled that where coal is purchased by a railroad company for use in operating lines of railway owned and controlled by it, in

order that they may be continued as a going concern, and where it was the expectation of the parties that the coal was to be paid for out of the current earnings, the indebtedness, as between the party furnishing the materials and supplies and the holders of bonds secured by a mortgage upon the property, is a charge in equity on the continuing income, as well that which may come into the hands of a court after a receiver has been appointed as that before. It is immaterial in such case, in determining the right to be compensated out of the surplus earnings of the receivership, whether or not during the operation of the railroad by the company there had been a diversion of income for the benefit of the mortgage bondholders, either in payment of interest on mortgage bonds or expenditures for permanent improvements upon the property. Nor is the equity of a current supply claimant in subsequent income arising from the operation of a railroad under the direction of the court affected by the fact that, while the company is operating its road, its income is misappropriated and diverted to purposes which do not inure to the benefit of the mortgage bondholders and are foreign to the beneficial maintenance, preservation and improvement of the property."

In the opinion in that case the court observed that it did not intend to detract from the force of the intimations contained in *Kneeland* v. *American Loan & Trust Co.* and *Thomas* v. *Western Car Co.*, above cited, "as to the necessity of a court of equity confining itself within very restricted limits in the application of the doctrine that in certain cases a court, having a road or fund under its control, may be justified in awarding priority over the claims of mortgage bondholders to unsecured claims originating prior to a receivership." And it was further said: "In neither the *Kneeland* nor the *Thomas case* was there any intention to question the prior decisions of the court, which allowed priority to claims based upon the furnishing of essential and necessary current supplies, not sold upon mere personal credit, against the surplus income arising during the operation of the road under the direction of a court of equity."

It is apparent from an examination of the above cases that

the decision in each one depended upon its special facts. This court has uniformly refrained from laying down any rule as absolutely controlling in every case involving the right of unsecured creditors of a corporation, whose property is in the hands of a receiver, to have their demands paid out of net earnings in preference to mortgage creditors.   But it may be safely affirmed, upon the authority of former decisions, that a railroad mortgagee when accepting his security impliedly agrees that the current debts of a railroad company contracted in the ordinary course of its business shall be paid out of current receipts before he has any claim upon such income; that, within this rule, a debt not contracted upon the personal credit of the company but to keep the railroad itself in condition to be used with reasonable safety for the transportation of persons and property, and with the expectation of the parties that it was to be met out of the current receipts of the company, may be treated as a current debt; that whether the debt was contracted upon the personal credit of the company, without any reference to its receipts, is to be determined in each case by the amount of the debt, the time and terms of payment, and all other circumstances attending the transaction; and that when current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of any funds thus improperly diverted from their primary use.   The doctrine announced in *Burnham* v. *Bowen* — in which case the decisions in prior cases were affirmed — is thus expressed in the recent case of *Virginia & Alabama Coal Co.* v. *Central Railroad Company*, above cited: "The dominant feature of the doctrine as applied in *Burnham* v. *Bowen,* is that, where expenditures have been made which were essentially necessary to enable the road to be operated as a continuing business, and it was the expectation of the creditors that the indebtedness created would be paid out of the current earnings of the company, a superior equity arises in favor of the material man as against the mortgage bonds in the income arising both before and after the appointment of a receiver from the operation of the

property. The equity thus held to arise when a purchase of necessary current supplies is made by the owning company is not in anywise influenced by the fact that the company itself is the purchaser of the supplies, but is solely dependent upon the fact that the supplies are sold and purchased for use and that they are used in the operation of the road, that they are essential for such operation, and that the sale was not made simply upon personal credit, but upon the tacit or express understanding that the current earnings would be appropriated for the payment of the debt."

Can the decree below be sustained consistently with these principles? Are the debts due the Carnegie Company of the class designated in the adjudged cases as current debts contracted, not on the personal credit of the railroad company, but in the ordinary course of its business and to be met out of current receipts? As already said, whether the parties, seller and buyer, had in view only the personal credit of the latter is to be determined in each case by its special facts, including the amount of the debt and the terms of payment.

All the rails furnished by the Carnegie Company were not supplied under one contract — a circumstance not to be ignored when determining whether the debts were of the kind that would ordinarily be met out of current receipts. The first contract between the Carnegie Company and the Danville Company was made June 10, 1891 — within less than twelve months before the appointment of receivers in the Clyde suit. It called for the delivery by the Carnegie Company, during the month of July, 1891, of only 2500 gross tons of rails for which the railroad company was to pay thirty dollars per gross ton, in its notes at four months from date of shipment *without interest*, with privilege of one renewal for three months with interest at the rate of 5 per cent per annum, and a second renewal for three months with interest at the rate of 6 per cent per annum. The railroad company reserved the option to increase by 200 or 300 the number of tons to be delivered, making the total delivery 2700 or 2800 tons. That option was exercised. By another arrangement between

the parties entered into July 21, 1891, the contract was further extended to cover 1656 tons of rails at the same price, terms and delivery. Subsequently, by agreement of October 2, 1891, provision was made for the delivery of 200 additional tons at the price of $26 per ton. The delivery of the rails was in varying amounts and at different times between July 25, 1891, and October 10, 1891. The whole quantity delivered was $4203\frac{2350}{2440}$ tons, worth $125,067.39. Notes were given by the railroad company, and they were renewed at their respective maturities. Those last given, and which were unpaid at the time of the institution of the Clyde or insolvency suit, were each payable at three months, except the last one, which was at four months. They were of the following dates and amounts : March 21, 1892, $38,251.77; March 24, 1892, $35,499.38; April 4, 1892, $12,786.16; May 16, 1892, $5355.09; June 7, 1892, $33,174.99. The first note was due June 21–24, 1892, (six days only after the appointment of receivers in the Clyde suit,) and the last October 7–10, 1892.

The rails so received from Carnegie Company were used by the Danville Company on the following roads in its possession and under its control: 1108.5 tons 56℔, $33,174.99, on the Northeastern Railroad of Georgia; 1270 tons 70℔, $37,713.75, on the Virginia Midland Railroad; 1793.5 tons 70℔, $53,258.69, on the Richmond and Danville Railroad; 31.2 tons 70℔, $920.56, on the Georgia Pacific Railroad. This use of the rails is shown by the report of special masters, and to that report on this point no exceptions were filed by either party.

What was the condition of the roads owned and controlled by the Danville Company at the time the rails were purchased and used? It was in the power of the railroad company and its receivers, who had possession of the books of the company, to have furnished evidence on this point that would have removed all possible doubt. But there is enough in the record to show that the rails purchased from the Carnegie Company were needed in order that the roads in question might be kept by the railroad company in that condition of safety which its duty to the public and to the mortgage bondholders required. In August, 1892, *immediately after the receivers took posses-*

*sion of the railroads constituting the Danville system,* they reported to the court that the financial difficulties of the Danville Company during the previous two years had " prevented the operating officers from being able to expend the proper amount *for new rails, and upon the roadbed and structures, to keep the railroad in the condition in which it should be maintained,* and it will be necessary for the receivers, during the summer and autumn, to make a much larger expenditure than they would for ordinary maintenance." Here is a direct admission by the receivers that during the *two years* immediately preceding their appointment the railroad company had not expended for new rails and upon the roadbed and structures the amount necessary to keep its road in proper condition. There is no evidence in the record which even tends to show that the statements of the receivers on this point were not strictly accurate. But this purchase of new rails proved to be inadequate; for on the 27th of January, 1894, the foreclosure receivers represented to the court, by petition, that "for *the proper* and *economical* operation of the lines of railroad of which they are receivers, and *for the safety of passengers and property transported over such roads,* as required by the order of this court appointing such receivers, two thousand tons of new steel rails are *an absolute necessity;*" and that they "had negotiated with and purchased from the Carnegie Steel Company, Limited, subject to the approval of the court, that quantity of rails at the cost of $24 per ton." The court made an order in accordance with that petition. Again, on the 13th day of April, 1894, the court — all parties to the foreclosure suit consenting thereto, including the bondholders' committee — made an order authorizing the receivers to purchase 2500 tons of new steel rails in order " *to properly operate the railroads* " in their charge, " *and for the safety of persons and property transported.*"

It is apparent that the purchases of new steel rails while the railroads were in possession of receivers were made in the ordinary course of business and were properly chargeable upon and payable out of current receipts in preference to the claims of mortgage creditors. In every substantial sense the

expenses thus incurred were operating expenses. They were incurred in the interest of mortgage creditors, the value of whose securities depended upon the unity of the Danville system being preserved and the interests of all concerned not allowed to go to ruin. Why should a different rule be applied to the contracts made with the Carnegie Company *shortly before the appointment of receivers in the Clyde suit,* the original contract being for only 2500 tons, and the last one for only 1656 tons? Is it to be said that the contract for 2000 tons of steel rails and the contract for 2500 tons made by the receivers in the foreclosure suit created debts of a preferential character, while contracts made by the railroad company of exactly the same kind shortly before the appointment of receivers for 2500 and 1656 tons of steel rails could not under any circumstances become a preferential debt chargeable upon current receipts? Surely the quantity of rails purchased from the Carnegie Company and delivered in 1891 was insignificant in view of the interests involved and the extensive mileage of the Danville system, and was by no means so large as to suggest that they were to be used in constructing new and additional road, and not to keep existing roads in proper condition for use. Every railroad company must have on hand a limited quantity of rails in order to keep every part of its line in proper and safe condition. It is evident that the Carnegie rails purchased shortly before the receivers in the Clyde suit were appointed — the rails here in question — were obtained for the same reason that induced the subsequent purchases by the receivers. No one will say that the use of these rails did not add directly to the value of the securities of mortgage creditors. Within the reason of the rule adverted to, the debts contracted with the Carnegie Company were as much current debts in the ordinary course of the business of the railroad company as were the debts contracted by the receivers under the orders of court, when they purchased new rails to put the road in safe condition, or when they purchased at one time four passenger locomotives, and at another time eight passenger and freight locomotives, the cost of which was charged upon the income in their hands. Is it to be said

that such expenses incurred by the receivers were preferential debts, but that debts incurred by the railroad company shortly prior to the receivership for rails needed to keep its road in safe condition for use are not of that class?

We next inquire whether it was not at the time the expectation of both parties, vendor and vendee, that the rails delivered by the Carnegie Company between July 25, 1891, and October 10, 1891, should be paid for out of the current earnings of the railroad company? The attendant circumstances require an affirmative answer to this question, although the parties did not in express words declare that the debts due contracted with the Carnegie Company were to be charged upon the current earnings of the railroad company. The quantity of rails was not so large as to preclude the expectation that they could be paid for out of the current earnings of the railroad company. As already said, it was a very small quantity for purposes of ordinary or necessary repairs, and there is nothing in the record to show that the Carnegie Company relied merely or exclusively on the personal credit of the railroad company. The renewal notes executed by the railroad company were *all* within the *three* months *immediately preceding the appointment of the receivers.* The short credit given strongly indicates, and the fair inference from the record is, that the parties contemplated that the rails were to be paid for out of the current earnings of the railroad. The taking of notes does not indicate the contrary, but only shows that the vendor company preferred to have its debt evidenced by commercial paper which it could use, rather than to stand upon open account. In *Burnham* v. *Bowen* it was said: " When the receiver was appointed the debt was evidenced by business paper maturing at a future date. It was no waiver of any claim on the fund which might come into the hands of the receiver to renew the paper at maturity for the convenience of the holder. It was undoubtedly given originally to enable the coal company to use it as commercial paper if occasion required, and the renewal may have become desirable on account of the use which had been made of it." The equities of the creditor furnishing that which protected and preserved

the mortgage security and materially increased its value are none the less because the original debt was evidenced by the notes of the company, taken for its convenience and renewed for its accommodation.

It may be said that a part of the rails furnished by the Carnegie Company were not used on the Danville railroad, although used on roads belonging to the Danville system. But that is not a controlling circumstance. The contracts were made with the Danville Company, and, as between the contracting parties, the debts so incurred were, under the circumstances stated, current debts chargeable upon the current receipts of the railroad company that purchased the rails. The rights of the Carnegie Company are none the less because the Danville Company chose, after obtaining the rails, to use a part of them on roads under its control and in its possession, and whose preservation in proper condition was vital to its successful operation. The scheme of reorganization was in the interest of the stockholders and mortgage creditors of the roads constituting the Danville system, and chiefly of the bondholders represented by the Central Trust Company, the trustee in the consolidated gold mortgage. That company, as we shall presently show, stood by and assented to, indeed approved, the application, for the benefit of the bondholders represented by it, of funds which should have been applied in payment of current debts contracted in the interest of mortgage creditors before the appointment of receivers in the Clyde suit. Suppose the court had directed the receivers in the Clyde suit, before turning over the property to the receivers in the foreclosure suit, to pay the claims of the Carnegie Company, is it possible that the mortgage creditors would have been heard to object to such an order? Certainly not, if it appeared, as it does satisfactorily appear in the present case, that the Carnegie debts were incurred in the ordinary course of business for the purpose of keeping the railroad in safe condition for use by the public. If the Carnegie claims were preferential debts when the control of the property passed from the railroad company to the receivers in the insolvency or Clyde suit, the latter were bound in equity to

do what the railroad company would have been required to do if it had retained control of the property.

If the parties to the contract contemplated that the notes given for the rails should be paid for out of the current earnings of the railroad, and if the Carnegie Company lost no equity merely by renewing the notes, it follows, under the settled doctrine of this court, that the mortgagees could not have objected to the payment of the renewal notes out of any net earnings in the hands of receivers, although the contract for the rails was a few months back of the six months immediately preceding their appointment. Each case, as already observed, must depend largely upon its special facts. In some cases the courts, in their administration of railroad property by receivers, have refused to give priority to unsecured claims that did not accrue within six months immediately preceding the appointment of receivers. Such a rule will do full justice in most cases to creditors who are entitled to look to current receipts for the payment of current debts. But no absolute rule on the subject has been prescribed by statute or by judicial decisions. A claim accruing back of the six months immediately preceding the appointment of a receiver may, under the circumstances of particular cases, be accorded the same priority in the distribution of earnings that belongs to like claims arising within that period. Touching this question of time and the principles upon which the equitable rights of creditors in such cases as this rest, Mr. Justice Brewer said, in *Blair* v. *St. Louis &c. Railway Co.*, 22 Fed. Rep. 471, 474: "The idea which underlies them I take to be this: that the management of a large business, like that of a railroad company, cannot be conducted on a cash basis. Temporary credit, in the nature of things, is indispensable. Its employés cannot be paid every month. It cannot settle with other roads its traffic balances at the close of every day. Time to adjust and settle these various matters is indispensable. Because, in the nature of things, this is so, such temporary credits must be taken as assented to by the mortgagees. . . . In this view, such temporary credits accruing prior to the appointment of the receiver must be recognized by the mortgagees

and such claims preferred.   Now, for what time prior to the appointment of a receiver may these credits be sustained? There is no arbitrary time prescribed, and it should be only such reasonable time as, in the nature of things and in the ordinary course of business, would be sufficient to have such claims settled and paid.   Six months is the longest time I have noticed as yet given.   Ordinarily, I think that is ample. Perhaps, in some large concerns, with extensive lines of road and a complicated business, a longer time might be necessary."

What was done with the earnings of the property that originally came to the hands of the receivers, as well as with the earnings during the receivership under the Clyde bill and also during the receivership in the foreclosure suit instituted by the Central Trust Company?   As to these matters there is no room for dispute.   Assuming, in view of what has been said, that the claims of the Carnegie Company were current debts chargeable upon current earnings of the railroad property, even while in the hands of the receivers, and therefore to be preferred to claims of mortgage creditors, the next inquiry is whether the current receipts were applied during the receiverships for the benefit of the bondholders or otherwise when they should have been applied to the payment of current or preferential debts including the debts due to the Carnegie Company.

During the insolvency or Clyde receivership, from June 17, 1892, to July 31, 1893, the net earnings were $3,297,792.31. Among the items of expenditure during the same period were the following: Construction, $232,134.34, of which $19,717.05 was for *construction on the Danville road;* Equipment, $81,390.32, of which $74,733.28 was *for equipment on the Danville road;* Interest, Rentals and Dividends, $3,249,481.89, of which $396,522.14 was *for the Danville road,* $709,324 for the Virginia Midland, $20,265 for the North Eastern, and $232,127 for the Georgia Pacific road, the last four roads being those on which, according to the special master's report, the Carnegie rails were used; Sinking Fund, Richmond and Danville road, five per cent equipment mortgage, $67,205, and Car Trust payments, $209,500.

Between August 1, 1893, and December 31, 1893, out of the net earnings of the Danville system, excluding certain lines, the receivers paid among other sums the following : Construction *on Danville road*, $9232.61; Equipment on same road, $6791.35 ; Interest, Rentals and Dividends, $626,735.85, which included $48,082.90 for the Danville road, Virginia Midland, $199,664.50, and $87.50 for the North Eastern Railroad ; Sinking Fund, Danville Company, equipment mortgage, $37,790; Car Trust payments, $51,160.

The above figures are found in the statement of the result of the operations of the Danville system for the periods named.

Looking at the cash statement of the receipts and disbursements of the Richmond and Danville Railroad alone, we find that from June 16, 1892, to July 31, 1893, the receipts were $15,432,055.46. In this sum were included $480,427.91 cash received from the Danville Company when the Clyde or insolvency receivers were appointed, and $671,363.40 collected on accounts turned over to those receivers by the railroad company. The disbursements during the above period were $15,290,730.27, leaving in the hands of the receivers on July 31, 1893, $141,325.19 in cash which was turned over to the foreclosure receivers. The disbursements included among other items the following : Interest and Rentals, $3,249,481.89 ; Car Trust payments and Sinking Funds, $486,368.16.

The account of disbursements for the Danville road from August 1, 1893, to November 30, 1893, shows, among other things, the payment of Interest and Rentals, $591,457.42 ; Car Trust payments and Sinking Fund, $88,950.

The total floating debt of the Richmond and Danville Railroad remaining unpaid was $318,324.71, of which $22,186.53 represented a claim of the Western Union Telegraph Company in part for labor and supplies and in part for construction of telegraph line, and $90,000 represented a claim of the Pullman Palace Car for mileage of cars. Of the balance, $125,067.39 represented the claims of the Carnegie Company, and $80,317.98 represented all other claims.

These figures show that both during the receivership in the

Clyde suit and the receivership in the foreclosure suit immense sums were expended in paying interest, sinking fund and car trust debts, and for construction and equipment, which were all for the benefit of mortgage creditors, and which, to the extent necessary, should have been applied in payment of preferential claims, including those of the Carnegie Company. It is a clear case of a diversion of income from the payment of current debts in the interest of mortgage creditors. Judge Simonton well said: "There can be no question that the steel rails furnished by the Carnegie Steel Company come within the class of supplies necessary to keep the railroad company a going concern; and the evidence establishes the fact that after incurring the debt the railroad company was in the receipt of large earnings, which were applied to permanent improvements, rentals and interest on the mortgage debt; that the receivers who, under the Clyde bill, took possession of the property, earned large income which was applied in the same way, leaving this debt unpaid; and that when these receivers were discharged they showed in their accounts a cash surplus, which was duly paid over to their successors under the Central Trust Company bill." Looking at the case in the light of the principle that a mortgagee cannot require from the mortgagor an account of the earnings, tolls and income until he has made demand therefor or for a surrender of possession under the provisions of the mortgage, *Sage v. Memphis & Little Rock Railroad*, 125 U. S. 361, 378; *Fosdick v. Schall*, 99 U. S. 235, 253, the Circuit Court of Appeals also said: "When, therefore, the receivers appointed at the instance of stockholders and creditors took possession, they enjoyed the same right to the earnings and income which the railroad company enjoyed, and rightfully received them. As the railroad company would have been bound to use this income in the payment of the current expenses for labor and supplies, the receivers should have done so also; but, instead of this, the receivers diverted the earnings, income and funds in their hands toward the betterment of the property, permanent improvements and additions to it, and in payment of interest. And this was natural. They were appointed to

take possession of the property and to conserve it until a plan
of reorganization could be adopted and perfected.   To facili-
tate this plan, the property must be kept up.   To this end the
funds coming from earnings were used.   When the purpose
of the first receivership was accomplished, the mortgage
creditors came in and reaped the benefit.   Surely those
creditors whose claims were neglected, and from whom the
earnings were diverted, have the right to ask and receive at
the hands of the court the recognition and preservation of
their claims."   42 U. S. App. 150.   Judge Morris filed a con-
curring opinion and took the same general view of the case as
that expressed by Judge Simonton for the court.   He said
that the case was that of "a supply creditor seeking to be
paid out of the earnings which came to the receivers after
his debt matured and which were diverted by them, without
opposition from the mortgagee, to expenditures which directly
resulted in preserving the mortgaged property, which earnings,
if the receivers had not been appointed, there is no ground for
supposing would not have been applied by the company to the
payment of the supply creditor's debt."   42 U. S. App. 160, 161.

We must not be understood as saying that a general unse-
cured creditor of an insolvent railroad corporation in the hands
of a receiver is entitled to priority over mortgage creditors in
the distribution of net earnings simply because that which he
furnished to the company prior to the appointment of the
receiver was for the preservation of the property and for the
benefit of the mortgage securities.   That, no doubt, is an
important element in the matter.   Before, however, such a
creditor is accorded a preference over mortgage creditors in
the distribution of net earnings in the hands of a receiver of a
railroad company, it should reasonably appear from all the
circumstances, including the amount involved and the terms of
payment, that the debt was one fairly to be regarded as part
of the operating expenses of the railroad incurred in the ordi-
nary course of business, and to be met out of current receipts.

Passing by as unnecessary to be determined some of the
questions discussed by counsel, our conclusion is that as cur-
rent earnings which should have been applied in meeting cur-

rent expenses or liabilities, including the debt due the Carnegie Company, were diverted for the benefit of mortgage creditors, it was the duty of the court to see that that company was reinstated in its claim of priority over the mortgage creditors in the distribution or application of the net earnings of the property. That duty was properly performed by the Circuit Court, and the decree of the Circuit Court of Appeals affirming the judgment of the Circuit Court is *Affirmed.*

Mr. Justice White dissenting.

As I comprehend the record, the rails for which preferential payment is now allowed did not serve the purpose of ordinary repair and maintenance of the tracks in which they were laid. Moreover, my understanding of the proof is that it obviously shows there was no surplus revenue at any time legally applicable to the claim now allowed, and hence that no such revenue was diverted to the benefit of the foreclosing mortgage creditors during either of the receiverships by way of betterments or otherwise. Moreover, I think the proof is clear that, conceding every possible expense which can be claimed to have been a betterment or in any wise to have inured to the benefit of the foreclosing mortgage creditors, nevertheless as such mortgage creditors have contributed to the payment of the general creditors, by the assumption of receivers' certificates and cash contributions, a sum largely in excess of the amount of such payments for assumed betterments, etc., the mortgage creditors are entitled to credit for their advances, and therefore there would be a large balance in their favor. In effect, to state the presumed betterments and charge them against the foreclosing mortgage creditors without referring to or taking into account their contributions, is to charge them for betterments for which they have already paid. *St. Louis, Alton &c. Railroad* v. *Cleveland, Columbus &c. Railway,* 125 U. S. 658.

I therefore dissent.

Mr. Justice Brewer, not having heard the argument in this case, did not participate in the decision.