GUARANTY TRUST CO. OF NEW YORK v. GALVESTON CITY. R. CO. et al.

SAME v. CITY OF GALVESTON et al.

(Circuit Court of Appeals, Fifth Circuit. March 19, 1901.)

No. 969.

1. MUNICIPAL CORPORATIONS—ORDINANCE AUTHORIZING STREET RAILROAD—CONSTRUCTION.

An ordinance of the city of Galveston embodied a contract between it and promoters of the Galveston City Railroad Company, whereby the latter was given the right to construct and operate its railway on condition that, in lieu of a percentage on its net receipts and of a bonus for the contract, 600 shares of its stock should be transferred to the city, as fully paid up. This was accordingly done, and it was entered as a stockholder on the company's books; and, as the ordinance provided, it was also represented by its mayor on the company's board of directors, when he voted for a resolution mortgaging the company's railway system. *Held*, that a further provision in the contract that, in the event that the company should allow itself to be incumbered with debt, the city should have a lien on the company's franchise and property, to be secured to it by proper process after its organization, did not make the city in any sense a creditor of the company, and that the lien was intended merely to secure its interest as a stockholder, giving it a preference in the distribution of the capital stock or net assets of the company, but postponing it to the rights of the mortgagee and other creditors.

2. CORPORATIONS—CONTRACT WITH STOCKHOLDER—PREFERENCE TO CREDITORS—VALIDITY.

A contract between a corporation and a stockholder by which the latter is to receive the par value or any part of his stock before all the corporate debts are paid is contrary to public policy and void.

3. STATUTES OF STATE—INTERPRETATION IN FEDERAL COURTS.

The federal courts will follow the supreme court of a state in the interpretation of its statutes.

4. SAME—PROVISIONS AS TO RECEIVERS—APPLICATION TO RECEIVERS IN FEDERAL COURTS.

Rev. St. Tex. arts. 1472, 1489, 1490, authorizing the appointment of receivers, defining their powers and duties, and regulating their proceedings, are inapplicable to receivers in the federal courts.

5. STREET RAILROADS—MORTGAGE—FORECLOSURE—RECEIVERSHIP—ADMINISTRATION OF PROPERTY—PREFERRED CLAIMS.

A court of equity, engaged in administering mortgaged railroad property under a receivership in a foreclosure suit, in distributing the income or proceeds of the property may prefer to the prior mortgage lien unpaid claims for current expenses of its ordinary operation within a limited time before the receivership; and hence the preference in such a case of claims for current expenses of a street railroad accruing five or six months before the receiver's appointment was proper, but not of claims for labor and materials furnished, at the latest, a year and a half prior thereto, and for which the company's notes had been given and renewed beyond the date of the receiver's appointment.

6. SAME.

A creditor of a street-railroad company is not entitled to a preference over a mortgage lien in the distribution by a receiver of the income or proceeds of the property on foreclosure simply because that which he furnished the company prior to the receiver's appointment was for the preservation of the property and for the benefit of the mortgage security, though that would be important in considering the equity of his claim to a preference.

**7. MORTGAGES—DELIVERY—PRESUMPTION.**

The date of acknowledgment of a mortgage differing from the date of the mortgage, the mortgage, in the absence of any evidence on the subject, will be held to have been delivered when it purports to be acknowledged.

**8. MORTGAGE OF STREET RAILROAD—SCOPE OF LIEN—AFTER-ACQUIRED PROPERTY.**

A mortgage of a street-railroad system covering after-acquired property creates a lien on engines thereafter furnished to the company in constructing a plant which was a part of its system, and is not to be displaced by a stipulation in the contract of sale that title should not pass till they were fully paid for.

**9. CHATTEL MORTGAGES—FAILURE TO RECORD—PRIORITIES.**

Rev. St. Tex. art. 3328, provides that mortgages or other instruments intended to operate as liens on undelivered personalty shall be absolutely void, as against subsequent mortgagees in good faith unless forthwith deposited for record; and hence a Texas chattel mortgagee that failed to record its mortgage till several months after another mortgagee had secured in good faith an effective mortgage on the same property lost its priority.

Appeal from the Circuit Court of the United States for the Eastern District of Texas.

On October 13, 1897, the Guaranty Trust Company of New York, as complainant, filed its bill against the Galveston City Railroad Company, as defendant, for the foreclosure of a mortgage executed by the defendant upon its entire system of railways and other property, particularly described therein, then owned by it in the city of Galveston, or that should be thereafter acquired by it, to secure its several consolidated mortgage bonds, for the sum of $1,000 each, and aggregating $1,000,000, dated January 1, 1893, and praying the sale of the mortgaged property, in the usual form in such bills. A receiver was appointed, in accordance with the prayer of the bill, who immediately qualified and took possession of the property. On August 14, 1898, the complainant filed an amendment to its bill, by which it made the city of Galveston a party defendant, alleging that said defendant the city of Galveston was the holder and owner of 600 shares of the capital stock of said Galveston City Railroad Company, and that said city of Galveston, by virtue of such ownership and of certain contracts and agreements with said railroad company relating thereto, claims some interest in or lien upon the mortgaged property. The city of Galveston answered, and alleged that by virtue of its ownership of said stock, and of the contracts or agreements referred to, it was the owner of an undivided interest in all the property of said Galveston City Railroad Company, which undivided interest was free and clear of all debts of the company, but stated, if it should be held that its interest in the affairs of said railroad company is not as tenant in common of the property and franchises of said company, that at least its said 600 shares of the capital stock thereof, at not less than their par value, constitute a preferred claim against all the corporate property and franchises of said railroad company, and that out of the same, or the proceeds thereof if sold, it was entitled, over and before all other claims, including that of the complainant, to receive the full amount of its said shares of capital stock at not less than their par value. The promoters of the incorporation and organization of the defendant railroad company entered into a contract with the city of Galveston, defendant, that, in consideration of the granting by the city to said promoters of certain franchises, rights of way, and other privileges, the promoters, for themselves, and for the defendant railroad company when incorporated and organized, stipulated and agreed to construct and operate a street-railway system in said city of Galveston, and to make over and transfer to said city, in lieu of percentage on the net receipts of the railroad so constructed and operated, and in lieu of bonus for the contract, 600 shares of the capital stock of said railroad company, free of cost and expense to the city.

By act of the legislature of the state of Texas the said railroad company

was incorporated and organized, and the railroad constructed, equipped, and operated as contemplated by said contract. The provisions of the contract referred to, material to the question in controversy, are as follows, to wit: "(1) Said party shall make over and transfer to the city of Galveston, in lieu of percentage on the net receipts of said roads, and in lieu of bonus for this contract, six hundred shares of the capital stock of said railroads; said six hundred shares of stock to be paid up by said party, or the company to be formed under this contract and franchise, as assessments on said stock may be made and payment required by said party or company. (2) The mayor of the city of Galveston, or some person designated by him, shall have his name placed continuously on the directorial ticket of said company, to represent the interests of the city in the said stock; and he shall be elected a director of said company at the election of directors. (3) In the event that said company shall allow itself to become incumbered by debt to the jeopardy of the city's interest therein, then the city shall be regarded as having thereby a first lien on the franchise and the roads and fixtures and corporate property of said company, and the same shall be secured to the city, by proper process, immediately after the organization of said company. (4) The said railroad, cars, fixtures, and other appurtenances shall revert to the city, if the city shall so determine, at the expiration of said twenty years' privilege, on a valuation to be ascertained by two disinterested persons, one to be appointed by the company and the other by the city; and, in case of disagreement as to said valuation between said persons thus appointed, a third party or umpire shall be appointed by one of the district courts, the decision thereby had to be final. (5) Know all men by these presents that whereas, on the 24th day of May, A. D. 1866, B. Rush Plumley and his associates did make and enter into a contract with the city of Galveston, in said state, dated the day and year aforesaid, wherein it was stipulated, among other things, that 'the said party shall immediately make over and transfer to the city of Galveston, as consideration for this franchise, six hundred shares of the capital stock of said railroads, said six hundred shares of stock to be free of all cost or assessment whatever to the city now or hereafter,' and also that 'in the event that said company shall allow itself to become incumbered by debt, to the jeopardy of the city's interest therein, then the city shall be regarded as having thereby a first lien on the franchise and the roads and fixtures and corporate property of said company for the security of the interest of the city in said company, and the same shall be secured to the city by a first lien to be executed by the president and directors immediately after the organization of said company'; and whereas, by an act of the legislature of said state approved October 8th, 1866, A. D., said Plumley and his associates were made a body politic and corporate by the name and style of the Galveston City Railroad Company, and the said company has been fully organized under the said act of incorporation, and has made over and transferred to said city, in pursuance of the stipulations of said contract, six hundred shares of the capital stock of ten thousand shares of said company; and whereas, the said company is desirous of complying fully and in all respects with the provisions of the said contract hereinbefore referred to: Now, therefore, in consideration of the premises and in pursuance of said contract the said Galveston City Railroad Company have granted, bargained, and mortgaged, and by these presents do grant, bargain, and mortgage, unto the said city of Galveston the franchises, roads, fixtures, and corporate property of said company, to have and to hold the same unto the said city of Galveston and its assigns forever. This instrument is intended to create and does create a first lien on the franchise, roads, fixtures, and corporate property of said company in favor of the said city of Galveston, for the purpose of securing the interest of said city in said company in the manner and to the extent provided for in the contract hereinbefore referred to, and is not intended to create a lien for any other purpose whatever."

On October 29, 1898, the United States Mortgage & Trust Company of New York filed in the same court its bill of complaint against the same defendants, to foreclose a second mortgage executed to it, as trustee, by said railroad company, to secure certain bonds therein described, on which default in the payment of the interest had been made. The bill was answered by both de-

fendants, the city of Galveston making the same answer to this bill that it had previously made to the bill of the Guaranty Trust Company of New York. On March 14, 1899, the two foreclosure suits were, by order of the court, consolidated, under the number of 337, upon the equity docket of the court. On March 24, 1899, a final decree was rendered foreclosing both mortgages referred to, and ordering a sale of all the property covered by them, free from all claims and demands, transferring such claims and demands to and upon the proceeds of the sale, with like but no greater effect than the same appertained to the said properties themselves, and reserving all questions respecting such claims and their rank and classification for future determination. Pursuant to the decree all the property was sold for the sum of $905,000, and the sale duly confirmed by the court. The mortgage executed by the Galveston City Railroad Company to the Guaranty Trust Company of New York (then bearing the name of the New York Guaranty & Indemnity Company) is dated January 1, 1893; but its acknowledgment by the president and secretary of the railroad company bears date May 13, 1893, and by the president and secretary of the New York Guaranty & Indemnity Company, May 22, 1893. The mortgage was recorded May 27, 1893.

The claim of the city of Galveston, as presented in its answer, on account of its ownership of the 600 shares of the capital stock of the Galveston City Railroad Company, coming on to be heard, a decree was rendered adjudging that the city was entitled to recover of the Galveston City Railroad Company the sum of $30,000, with interest from the date of the decree, and that the amount should be paid out of the proceeds of the sale of the property in the custody of the court prior to the claim and lien of the complainants or of any interveners in the cause. By leave of the court a large number of interventions and claims were filed and reported on by the master, whose appointment was provided for in, and made in accordance with, the order of the court filed with the original bill in the cause. Many interventions and claims against the Galveston City Railroad Company were held by the master and by the circuit court to be liens upon, and entitled to payment out of, the surplus earnings of the property accruing during the receivership, prior to the payment of the bonds or the interest thereon secured by the mortgages foreclosed. Some of these claims were allowed as superior liens and prior in right to that of the holders of the bonds solely on the ground that certain statutes of the state of Texas gave such lien and priority. Others were allowed on the ground that they were preferential claims with equitable liens, and were also, preferential claims with a lien under and by virtue of the statutes of Texas referred to. Exceptions were duly taken before the circuit court to such allowances, which were overruled by the court, and decrees entered accordingly. The circuit court also entered a decree allowing the special master commissioner appointed to sell the property under the decree $7,500 as compensation for his services.

The Guaranty Trust Company of New York has appealed from the decree in favor of the city of Galveston for $30,000 on account of its interest in the defendant railroad company, also from the decrees entered on the various interventions and claims referred to, and also from the decree awarding the special master commissioner $7,500 as compensation for his services in selling the property. Of the errors assigned on the record by the appellant, the following assignments substantially cover all the points raised by them, to wit: "(1) The court erred: First, in rendering a decree in favor of the city of Galveston for thirty thousand dollars upon the claim as set forth in its answer herein; and, second, in decreeing that the city of Galveston, defendant, had and was entitled to a lien to secure the payment of said sum prior to the mortgage to this complainant, and was entitled to be paid said sum out of the proceeds of the sale of the mortgaged property prior to the holders of the bonds secured by the mortgage to this complainant. (2) The court erred in confirming the master's report upon the interventions of D. L. Bates & Bros., Frank Vallat, St. Louis Car Company, G. Herbert Brown, Thiel Detective-Service Company, Kracke & Flanders, Best, Fox & Co., T. L. Cross & Co., R. D. Nutall Company, Westinghouse Electric & Manufacturing Company, F. K. Fisher, Knapp Bros., T. F. Burke, F. E. Homer & Co., Barden-Streets Electrical Construction Company, L. V. Elder, Clarke & Courts, Plomo Spe-

cialty Manufacturing Company, Rice, Baulard & Co., Blum Hardware Company, Alex Easton, George A. Christie, Lovejoy & Sampson, Central Electric Company, Paul Shean Sanitary Plumbing & Manufacturing Company, Missouri Car & Foundry Company, Waters-Pierce Oil Company, Dickson Car-Wheel Company, Taunton Locomotive Manufacturing Company, Washburn & Moen Manufacturing Company, J. W. Davis Oil Company, Pratt & Cady Company, Mica Insulator Company, Galveston Dry-Goods Company. J. F. Smith & Bro., Goldmark & Wallace, and George H. Henchman, finding and reporting that under the statutes of the state of Texas each of such interveners had a lien upon, and was entitled to payment out of, the net earnings of the property in the custody of the court through its receiver in this cause, during the receivership herein, superior to the mortgage to this complainant, as trustee, foreclosed herein, and prior to the holders of the bonds secured by the said mortgage, and in overruling the exceptions of this complainant to the master's said report upon each of such interventions. (3) The court erred in confirming the master's report, and overruling this complainant's exceptions thereto, upon the interventions of the Central Electric Company, Paul Shean Sanitary Plumbing & Manufacturing Company, Missouri Car & Foundry Company, J. W. Davis Oil Company, Waters-Pierce Oil Company, Dickson Car-Wheel Company, Taunton Locomotive Manufacturing Company, Washburn & Moen Manufacturing Company, Pratt & Cady Company, Mica Insulator Company, Galveston Dry-Goods Company, J. J. Smith & Bro., Goldmark & Wallace, and G. H. Henchman, and decreeing that the indebtedness thus found to be due said interveners, respectively, was a preferential claim or equitable lien superior and prior in right to that of these complainants, and the holders of the bonds secured by the mortgage to these complainants as trustees, foreclosed herein, upon the earnings and income of the properties in the custody of the court in this cause for its payment and satisfaction, and that said interveners also have a lien, under the statutes of the state of Texas, upon the net earnings of said properties arising whilst under the management and control of the receiver in this cause, for the payment and satisfaction of said claims. (4) The court erred in confirming the master's report, and overruling this complainant's exceptions thereto, upon the intervention of the Lee Iron Works, and decreeing that the indebtedness thus found to be due said intervener was an equitable charge or lien prior and superior in right to the claims of the holders of the bonds secured by the mortgage to this complainant as trustee, and foreclosed herein, upon the properties and effects of the defendant Galveston City Railroad Company, and upon the tolls and income therefrom under the control of the receiver in this cause, as security for its payment, and directing the payment and satisfaction of intervener's said claim out of the proceeds arising from the sale of said properties, and out of the tolls and income therefrom, prior to the bonds secured by the mortgage to this complainant as trustee, and foreclosed herein. (5) The court erred in overruling complainant's exceptions to the master's report upon the intervention of Adoue & Lobit, and in confirming said report and decreeing that said interveners were entitled to recover, etc. (6) The court erred in overruling this complainant's exceptions to the master's report upon the intervention of Buckeye Engine Company, and in confirming said report and decreeing: First, that said intervener has a specific lien, by contract mentioned in said report, for the payment and satisfaction of the indebtedness found to be due said intervener, prior and superior in right to the lien created by the mortgage to this complainant as trustee; second, in foreclosing said specific contract lien upon said two engines prior to the said lien created by the said mortgage to this complainant, and ordering the sale of said engines to satisfy said lien; and, third, in decreeing that, should the proceeds from the sale of said two engines be insufficient to fully pay off and satisfy said claim, the intervener had, to the extent of said deficit, under and by virtue of the statutes of the state of Texas, a lien upon the earnings of the properties in the custody of the court in this cause, arising whilst under the management and control of the receiver in this cause, for the payment and satisfaction of the deficit, prior and superior in right to the lien created by the mortgage to this complainant as trustee and the bonds secured thereby; and, fourth, in not decreeing that the mortgage to this complainant as trus-

tee, and foreclosed herein, was a lien upon said engines superior to the specific contract lien given by the defendant company to said intervener, since it appeared that said mortgage to this complainant, as trustee was recorded as required by the laws of the state of Texas before the said contract lien, given by the defendant to said intervener. (7) The court erred in decreeing that John Grant should be allowed and paid out of the funds in or coming into the custody of the court in this cause, prior to the holders of bonds secured by the mortgage to this complainant as trustee, and foreclosed herein, the sum of seven thousand five hundred dollars, as compensation for his services as special master commissioner appointed to sell the property covered by the mortgage foreclosed herein."

. Since this appeal was perfected, the controversy with respect to the claim of Adoue & Lobit has been amicably adjusted and disposed of, and therefore the assignment of error relating thereto is waived.

J. T. Davis and Brainard Tolles, for appellant.

Jas. B. Stubbs, J. W. Terry, John D. Rouse, Wm. Grant, W. S. Hunt, and W. A. Kincaid, for appellees.

Before PARDEE and SHELBY, Circuit Judges, and TOULMIN, District Judge.

TOULMIN, District Judge, after stating the case as above, delivered the opinion of the court.

1. The first question presented on the record for our consideration is, what relation did the city of Galveston sustain towards the Galveston City Railroad Company,—that of stockholder or creditor? The contention of appellant is that the city's relation to and only interest in the railroad company was that of stockholder. The appellee does not insist that, as the result of the contract and mortgage, the city was a part owner in kind of the railroad property, as set up in its answer, or that it was both creditor and stockholder; and the appellee's counsel concedes that if the city's status was that of a stockholder, common or preferred, it was not a creditor. But the contention is that it was a creditor of the railroad company; that "the question is, what was the substance? and not what was the form of the city's status"? To use the language of the court in Corcoran v. Powers, 6 Ohio St. 19, "The question in such cases is not, what did the parties call it? but, what do the facts require the court to call it?" It appears that the city of Galveston passed an ordinance embodying a contract between itself and certain promoters of the Galveston City Railroad Company, whereby the city granted said company the right to construct and operate, for a term of years, railways along and across certain specified streets of the city, upon certain conditions. In the contract it was provided that in lieu of percentage on the net receipts of said railroad, and in lieu of bonus for the contract, 600 shares of the capital stock of said railroad should be made over and transferred to the city of Galveston; said 600 shares of stock to be paid up by said promoters, or by the company to be formed under the contract and franchise. The railroad company was duly incorporated and organized, and 600 shares of the capital stock of the company, of the par value of $50 each, were issued as fully paid up stock to the city, as provided by the contract. The city was entered as a stockholder on the books of the company. It was represented on the board of directors by its mayor, who was by agreement elected a director to represent its interest. It had

the right to vote in the management of the company, and to share in the distribution of dividends. It was represented at the meeting of the directors by its mayor, who, as one of the directors, participated in said meeting, and voted for the resolution authorizing the issuance, execution, and sale of the bonds and the execution and delivery of the mortgage involved in this suit. The city's stock was a part of the capital stock of the company, and it is clear that it possessed not only the characteristics, but the essential properties, of capital stock. But it is said that the company granted to the city a first lien on its franchise and other property for the security of the city's interest in the company; and it is argued by the learned counsel for the city "that the contract would have been meaningless if this lien obligation was ineffectual to shield the city's rights from the consequences of indebtedness incurred by the company," and it is contended that the city's stock, security, or debt, by whatever name it may be called, "should not become worthless by extinguishment, but should be paid before other claims against the company, thus clearly making it a debt, and placing the city in the attitude of a creditor." A debt is a sum of money due by contract, express or implied. The sum of money may be payable at a fixed time or upon a contingency. When payable upon a contingency, it becomes a debt only when the contingency has happened. Black, Law Dict. 336, and authorities cited in notes. A creditor is one to whom a debt is owing by another person, called the "debtor." Black, Law Dict. 299, tit. "Creditor." "In its strict sense, a creditor is one to whom money is due. In a more general and extensive sense of the term, a creditor is one who has a right to recover money of another on any account whatever." 8 Am. & Eng. Enc. Law (2d Ed.) 239, 240. Where are the facts and circumstances in this case which show that the Galveston City Railroad Company owed to the city of Galveston any sum of money due by contract, express or implied, payable at a specified time or on a contingency? There was no contract by which the city was to receive a percentage on the net receipts of the railroad. There was no contract for a bonus to be paid to the city in consideration of the franchise, rights, and privileges granted by it to the railroad company, which was not to be paid or to become payable until the company allowed itself to become incumbered by debt. If a contract of this character might have been implied by the negotiations of the parties for such rights and privileges, whereby the city became a creditor, it ceased to be such creditor when it entered into the contract which was expressly made by them. That contract provided that:

"Said party [the promoter of the railroads] shall make over and transfer to the city of Galveston, in lieu of percentage on the net receipts of said road, and in lieu of bonus for this contract, six hundred shares of the capital stock of said railroad; said six hundred shares of stock to be paid up by said party, or by the company to be formed under the contract."

We find no language in this contract to express or imply the relation of creditor on the part of the city. But the language employed whereby the city was to acquire its interest in the company is apt to express the relation of stockholder. The instrument by which

the security was given recites the terms of the contract, and, in consideration thereof, creates and grants a lien on the corporate property of the company to secure the interest of the city in the company, in the manner and to the extent provided for in the contract. In our judgment, there was nothing in the contract which placed the city in the attitude of creditor to the company, or clothed it with a single attribute of a creditor, further than in the "sense in which every shareholder is a creditor of a corporation to the extent of his contribution to the capital stock." In the case of Hamlin v. Railroad Co., 24 C. C. A. 271, 78 Fed. 664, 36 L. R. A. 826, the court said:

"There is a sense in which every shareholder is a creditor of the corporation to the extent of his contribution to the capital stock. In that sense every corporation includes its capital stock among its liabilities. But that creditor relation is one which exists only between the corporation and its shareholders. It is a liability which is postponed to every other liability, and no part of the capital stock can be lawfully returned to the stockholders until all debts are paid or provided for. The violation of this well-understood principle is a breach of trust, and a creditor affected thereby may pursue the stockholders and recover as for an unlawful diversion of assets."

What, then, was the interest of the city which the company undertook to secure? It seems to us clear that it was its interest as a stockholder. When a corporation is dissolved by consolidation with another, or becomes involved in debt and concludes to stop operations and pay its debts, if there are any assets left after paying off the debts they are ordinarily distributed between the stockholders in proportion to the number of shares which each holds. There is no preference of one stockholder over other stockholders, except such preference is expressly contracted for. A preference as to capital stock or a distribution of net assets may be expressly contracted for. Such preferred stockholders, however, are not creditors of the corporation, but are stockholders entitled to a preference over the holders of common stock. Cook, Stocks & S. § 270; Clark, Corp. 367; Coulter v. Robertson, 57 Am. Dec. 168; Hamlin v. Railroad Co., supra. We think the interest of the city of Galveston in the Galveston City Railroad Company was one capable of being secured, and that the evident purpose of the company in providing security for that interest was to give the city a preference in the distribution of the capital stock or net assets of the company over other stockholders. It will not be presumed that the purpose of the company was to make a contract by which the city was to receive the par value or any part of its stock before all the debts of the company are paid. It would require the clearest language to show that such was its purpose. Our interpretation of the contract fails to disclose any such purpose. But, if it existed, the contract would be contrary to public policy and void. Cook, Stocks & S. §§ 271–278; Warren v. King, 108 U. S. 389, 2 Sup. Ct. 789, 27 L. Ed. 769; Hamlin v. Railroad Co., supra; Miller v. Ratterman, 47 Ohio St. 141, 24 N. E. 496. In Warren v. King, supra, the court said:

"One of the characteristics of capital stock is that no part of the property of a corporation shall go to reimburse the principal of capital stock until all the debts of the corporation have been paid."

And in Hamlin v. Railroad Co., supra, the court said:

"There is a wide difference between the relation of a creditor and a stock-holder to the corporate property. One cannot well be a creditor as respects creditors proper, and a stockholder by virtue of a certificate evidencing his contribution to the capital of the corporation. Stock is capital, and a stock certificate but evidences that the holder has ventured his means as a part of the capital. It is a fixed characteristic of capital stock that no part of it can be withdrawn for the purpose of reimbursing the principal of the capital stock until the debts of the corporation are paid. * * * If the purpose in providing for these peculiar shares was to arrange matters so that under any circumstances a part of the principal of stock might be withdrawn before the discharge of all corporate debts, the device would be contrary to the nature of capital stock, opposed to public policy, and void as to creditors affected thereby."

Our opinion is 'that the first assignment of errors is well made, and it is sustained.

2. The master reported numerous claims as simple or ordinary debts, which he held could not be classified as preferential claims or liens over that of the mortgage bondholders, upon the property or earnings of the defendant railroad company in the custody of the court, as they were without equitable liens thereon; but he held that the interveners had a lien, under the statutes of the state of Texas, upon the net earnings of the corporation, while in the hands of the receiver, for the payment of their said claims, prior and superior in right to the mortgage bondholders. To the master's report the appellant duly filed exceptions. The exceptions were overruled by the court, the report confirmed, and decrees rendered accordingly. This action of the circuit court presents the question whether the statutes of the state of Texas providing for the appointment of receivers, defining their powers and duties, and regulating proceedings under such appointment (Rev. St. Tex. arts. 1472, 1489, 1490), are applicable to receivers in the federal courts.

This court in the case of Bank v. Ewing, 43 C. C. A. 150, 103 Fed. 168, said:

"We do not think that either the laborers' lien law, or article 1472 of the Revised Statutes of Texas, regulating the distribution of funds that may come into the hands of a receiver of a state court, should or can be construed to have application to the classification of claims and priority of liens accruing against receivers appointed by the courts of the United States."

While the language quoted was used in reference to article 1472 of the statutes, and as applicable to the claim of an employé in the immediate service of the receiver, we can perceive no reason why it is not equally applicable to a claim existing against the corporation at the time the receiver was appointed, the payment of which is sought to be made from the earnings of the corporation while in the hands of the receiver, as provided by article 1490 of the statutes; that being the article under which the claims in question in this case were allowed as prior in right to the mortgage bondholders. Article 1490 is as follows:

"All judgments, claims or causes of action when determined, existing against any corporation at the time of the appointment of a receiver, shall be paid out of the earnings of such corporation while in the hands of the receiver, to the exclusion of mortgage action; and the same shall be a lien on such earnings."

Both articles are a part of a system of receiverships established by the legislature of Texas, and both relate to the distribution of funds that come to the hands of a receiver. Some of the provisions of this statute are admittedly not applicable to receivers and to proceedings under the appointment of receivers in the courts of the United States. It can hardly be supposed that the legislature intended some of the provisions of the same statute to apply to receiverships in the courts of the United States, and others not to apply. It will be observed that article 1490 creates no lien on the corpus of the property of the corporation in favor of claims existing against the corporation at the time of the appointment of a receiver, but gives a lien on the earnings of the corporation while in the hands of a receiver. Shall it be assumed that the legislature of Texas undertook to give a lien on funds in the custody of the federal courts, and to regulate the distribution of such funds by the receivers of those courts? We think not. However, it is needless to further pursue this discussion. The court of last resort of the state of Texas has interpreted the statutes in question. We follow the interpretation given to the statutes of a state by the supreme court of that state. First Nat. Bank v. Chehalis Co., 166 U. S. 440, 17 Sup. Ct. 629, 41 L. Ed. 1069; Nobles v. Georgia, 168 U. S. 398, 18 Sup. Ct. 87, 42 L. Ed. 515. In Fordyce v. Du Bose, 87 Tex. 78, 26 S. W. 1050, the supreme court of Texas said:

"The several acts of the legislature upon the subjects of receiverships do not purport by their language to affect receivers appointed by the federal courts in their official capacity, and courts will construe them so as to embrace such subjects as the legislature had the authority to legislate upon. These acts were not intended to affect the procedure of federal courts as to receivers appointed by such courts."

We fully concur in this opinion.

The decree of the circuit court confirming the master's report upon the interventions specifically set out in the second assignment of errors, and decreeing that under and by virtue of the statutes of Texas the interveners had a lien upon, and were entitled to payment out of, the net earnings of the property while in the hands of the receiver, prior and superior in right to the complainant and the holders of the bonds secured by the mortgage herein foreclosed, should be reversed.

3. The master reported a number of claims as preferential and entitled to an equitable lien, superior in right to that of the mortgage bondholders, upon the earnings of the receivership. Exceptions were duly filed to the report, which the court overruled, and in all respects confirmed the master's report, and entered decrees accordingly. "A court of equity engaged in administering mortgaged railroad property under a receivership in a foreclosure suit may prefer unpaid claims for current expenses of the ordinary operation of the railroad, incurred within a limited time before the receivership, to a prior mortgage lien, in the distribution of the income or of the proceeds of the mortgaged property." Bank v. Doud (C. C. A.) 105 Fed. 123; Southern R. Co. v. Carnegie Steel Co., 176 U. S. 257, 20 Sup. Ct. 347, 44 L. Ed. 458; Lackawanna Iron & Coal

Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 20 Sup. Ct. 363, 44 L. Ed. 475. The supreme court, in the cases cited, have, in effect, declared that, before an unsecured creditor can be accorded a preference over mortgage creditors in the distribution of net earnings in the hands of a receiver of a railroad, it should reasonably appear from the circumstances, including the amount involved and the terms of payment, that the debt was one fairly to be regarded as part of the operating expenses of the railroad, incurred in the ordinary course of business, and to be met out of current receipts. A creditor is not entitled to such preference and priority simply because that which he furnished to the railroad company prior to the appointment of the receiver was for the preservation of the property and for the benefit of the mortgage security. That, however, is an important element in the matter in considering the equity of the claim. The circuit court of appeals of the Eighth circuit, in the case of Bank v. Doud, supra, after an exhaustive "examination and-analysis of the facts and opinions in all the cases in the supreme court upon the subject of preferential claims in suits to foreclose mortgages of quasi public corporations," said the decisions of the supreme court will be found to assert the proposition that "the class of claims which may be awarded a preference in payment over the prior mortgage debt in equity is limited to claims for current expenses incurred in the ordinary course of the operation of the mortgaged property within a limited time before the appointment of a receiver." It appears from the record that there was no diversion of the current income from the payment of current expenses to the payment of interest on the mortgage debt, or to the permanent improvement of the mortgaged property. Hence the only question for us to determine here is whether there is error in the decree of the circuit court adjudging the claims now under consideration to be preferential claims, with an equity superior to the lien of the mortgage. Our opinion is there is no error in the decree, except as to the claims of the Dickson Car-Wheel Company, the Lee Iron Works, and a portion of the claim of the Paul Shean Sanitary Plumbing & Manufacturing Company. The claim of the Dickson Car-Wheel Company was for Barr motor wheels sold to the defendant railroad company on September 18, 1896, and used by the company on its cars. The amount involved is $14. The sale was presumably for cash,—nothing appears on the record to the contrary,—and it was made more than a year before the bill in this cause was filed. The claim of the Lee Iron Works appears to have been for labor performed and material furnished for the railroad company from December, 1895, to April, 1896, for which promissory notes were given at the time, payable at short intervals, and renewed from time to time, resulting finally in three notes, which fell due subsequent to the filing of the bill herein. The labor and material furnished were in connection with the railroad company's track, overhead line, engines, boilers, and cars. The claim of the Paul Shean Sanitary Plumbing & Manufacturing Company is for $743.05, for material furnished the railroad company in the necessary repair of the engine in its power house employed to generate the electricity by

107 F.—21

which its cars were propelled. Some of the material was furnished from time to time from July, 1895, to February, 1896, for which a note was given, and on which a partial payment was subsequently made and a new note given. Other material was furnished in March, 1896, for which a note was given, a partial payment afterwards made on it, and a new note given for the balance. Forty-three and 5/100 dollars of the claim is an open account for material furnished in September and October, 1897, a short time before the bill was filed and the receiver appointed herein. We think the Paul Shean Company's claim to the extent of $43.05, only, should be allowed. The balance of the claim does not, in our opinion, come within the doctrine declared by the supreme court, hereinbefore referred to. We, however, think that all the other claims decreed by the circuit court to be preferential claims, with a superior equity to the mortgage, do come within that doctrine, and that they should be so allowed. They were for current expenses incurred in the ordinary course of business, and may be fairly regarded as part of the operating expenses of the railroad. They accrued within five or six months before the appointment of the receiver.

4. It appears that the intervener the Buckeye Engine Company on September 16, 1892, made a contract with the defendant the Galveston City Railroad Company under which it sold to the defendant two engines and certain boilers and other machinery, the purchase price of which was $15,000, and for which the railroad company executed certain promissory notes. Some of the notes were paid, leaving the balance, aggregating $7,500, unpaid. By the original contract it was stipulated that the engines and boilers were to remain the property of the intervener until full payment therefor is made. The machinery was delivered and placed in position in March and April, 1893. The contract was filed in the proper office for registration on August 9, 1893. The intervener sought to fix the mechanic's lien on the property. The master held that said claim of lien was not well founded, but held that:

"By virtue of the reservation by the intervener of title to the aforementioned machinery until fully paid for, and the act of the legislature of Texas (Acts 1885, p. 76) declaring that all such reservations shall be held to be chattel mortgages, and by virtue of the fact that the said machinery was not delivered until after the mortgage under which the complainant claims had been executed, and that when delivered it carried with it the burden of the lien reserved by the intervener, the said intervener has a specific lien upon said two Buckeye engines for the payment and satisfaction of its said claim, prior and superior in right to the lien thereon created under and by virtue of said mortgage."

No exceptions to the master's report were filed by the intervener, but exceptions to the report were duly filed by the appellant, complainant below, which were overruled, and the report confirmed by the court.

The statute of Texas provides that:

"All reservations of the title to or property in chattels as security for the purchase money thereof, shall be held to be chattel mortgages, and shall, when possession is delivered to the vendee, be void as to creditors and bona fide purchasers, unless such reservations be in writing and registered as required of chattel mortgages: provided, that nothing in this law shall be

construed to contravene the landlord and tenant act." Article 3327, Rev. St. Tex.

The supreme court of Texas, in Harling v. Creech, 88 Tex. 300, 31 S. W. 357, held that the effect of the statute was to forbid conditional sales of personal property, or, rather, to convert all such contracts into chattel mortgages, and required registration of them to protect creditors and bona fide purchasers of the property.

The statute providing for registration of chattel mortgages is as follows:

"Every chattel mortgage, deed of trust or other instrument of writing intended to operate as a mortgage of or lien upon personal property which shall not be accompanied by an immediate delivery, and be followed by an actual and continued change of possession of the property mortgaged or pledged by such instrument, shall be absolutely void as against the creditors of the mortgagor or person making the same, and as against subsequent purchasers and mortgagees or lien holders in good faith, unless such instrument, or a true copy thereof, shall be forthwith deposited with and filed in the office of the county clerk of the county where the property shall then be situated, or if the mortgagor or person making the same be a resident of this state, then of the county of which he shall at the time be a resident." Article 3328, Rev. St. Tex.

The circuit court held, in effect, that the intervener had a chattel-mortgage lien by virtue of the contract in question, and decreed that it had a specific lien on said engines which was superior to that of the appellant's mortgage. In this we think the court erred. Both mortgages were subject to the registration laws of the state of Texas. The lien first registered as provided by those laws is superior. The record shows that the chattel mortgage was recorded on August 9, 1893, while the mortgage to appellant was recorded on May 27, 1893. The only ground, as appears from the report of the master, on which he based his ruling, and presumably the only ground on which the court sustained that ruling,—no other being disclosed by the record,—is that the engines were not delivered until after the mortgage under which the complainant (appellant) claims had been executed, and that when delivered it carried with it the burden of the lien reserved by the intervener. While the mortgage to appellant is dated January 1, 1893, it was not signed in the presence of and attested by subscribing witnesses, and it was not acknowledged until May 13, 1893. Rev. St. Tex. art. 630, provides that:

"Every deed or conveyance of real estate must be signed, or acknowledged, by the grantor in the presence of at least two credible subscribing witnesses thereto, or must be duly acknowledged before some officer authorized to take acknowledgments and properly certified to by him for registration."

"To convey title, it is necessary to deliver a completed deed." 9 Am. & Eng. Enc. Law (2d Ed.) 150; Walker v. Renfro, 26 Tex. 142; Railroad Co. v. Garrett, 52 Tex. 133; Tuttle v. Turner, 28 Tex. 759. A deed takes effect at the time of its delivery. Tuttle v. Turner, supra. "The law presumes, in the absence of evidence to the contrary, that the date of the deed is the date of delivery," but "this presumption is disputable, and the time of delivery may always be proved." 9 Am. & Eng. Enc. Law (2d Ed.) 153.

It does not appear when appellant's mortgage was delivered. There is no evidence on the subject. There are a number of authori-

ties to the effect that when acknowledgment is essential to the validity of a deed, and the date of the acknowledgment differs from the date of the deed, the deed was delivered at the date of the acknowledgment. 9 Am. & Eng. Enc. Law (2d Ed.) 152, 153, and authorities cited in note. Under the statute of Texas, a conveyance is not effective unless it is signed in the presence of and attested by two subscribing witnesses, or is acknowledged. The mortgage in question was not attested by witnesses, and was not acknowledged until May 13, 1893, which was subsequent to the delivery of the engines. It was not a completed deed until acknowledged. Under the statute of Texas, in the absence of attestation by witnesses acknowledgment is essential to the validity of the mortgage. The date of the acknowledgment of the mortgage differing from the date of the mortgage, we hold the mortgage to have been delivered at the date of its acknowledgment. The record shows that the engines were delivered and placed in position, and had become permanently a part of the railroad property, before appellant's mortgage became effective, on May 13, 1893. But, if the engines be treated as after-acquired property, appellant's mortgage covered all property then owned or to be thereafter acquired by the railroad company; and, under the rule well settled by the decisions of the supreme court, such mortgage created a lien which could not be displaced by the contract under which the engines were furnished, although it contained the stipulation that the title to the engines should not pass until they were fully paid for. Porter v. Steel Co., 122 U. S. 267, 7 Sup. Ct. 741, 30 L. Ed. 1210; Railroad Co. v. Hamilton, 134 U. S. 296, 10 Sup. Ct. 546, 33 L. Ed. 905; also, Phœnix Iron-Works Co. v. New York Security & Trust Co., 54 U. S. App. 408, 28 C. C. A. 76, 83 Fed. 757. No part of intervener's claim was for operating expenses or repairs. No part of it was for keeping a completed road in operation, either in the way of labor or material. But it accrued in the construction of a plant, which was a part of the railroad system. Railroad Co. v. Hamilton, supra; Wood v. Safe-Deposit Co., 128 U. S. 416, 9 Sup. Ct. 131, 32 L. Ed. 472. But it seems to us that no equitable principles are involved in intervener's claim. We think that the question at issue turns upon the legal rights of the parties under the registration laws of the state of Texas. The intervener having failed to record its chattel mortgage until after appellant's mortgage was recorded, it lost its priority, if it ever had any.

5. The award of $7,500 to the special master commissioner as compensation for his services in selling the mortgaged property under the decree of foreclosure is complained of by appellant as unreasonable and excessive. There was no reference had by the circuit court to ascertain what would be reasonable and just compensation to the special master commissioner, and it does not appear that any evidence on the subject was introduced before the court. Questions of this sort rest largely in the discretion of the circuit court, and are rarely interfered with on appeal; but, as this cause must be reversed and remanded, the circuit court is directed to order a reference to ascertain what would be reasonable compensation to be allowed said special master commissioner, and that all parties inter-

ested be duly notified of the time and place of holding said reference, and be permitted to submit evidence in the matter if they see fit to do so. Reversed and remanded to the circuit court, with instructions to enter a decree in accordance with the views herein expressed.