STATE BANK OF CHICAGO v. IDAHO–OREGON LIGHT & POWER
CO. et al.

(District Court, D. Idaho, S. D.   November 12, 1914.)

1. CORPORATIONS ☞480 — MORTGAGES — CONSTRUCTION AND OPERATION — AFTER-ACQUIRED PROPERTY CLAUSE.

   A mortgagee of an electric light and power company, under an after-acquired property clause in its mortgage, has no greater right than the mortgagor in additional transmission lines constructed for it entirely at the cost of another company under an agreement that the material used should remain its property until full payment for the extensions was made, with the right to remove the same in case of default.

   [Ed. Note.—For other cases, see Corporations, Dec. Dig. ☞480; Mortgages, Cent. Dig. § 428.]

2. CORPORATIONS ☞186—CONTRACTS—ENFORCEMENT—CONTRACT WITH MAJORITY STOCKHOLDER.

   The fact that the company building the lines owned the majority of the stock of the power company does not debar it from enforcing its rights under the contract, where it was made in good faith and was fair.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 695–701; Dec. Dig. ☞186.]

3. ESTOPPEL ☞91—EQUITABLE ESTOPPEL—ACQUIESENCE IN DECREE.

   Practically all of the stock of an electric light and power company was owned by a railway company which entirely controlled its affairs. It also built for the power company certain extension lines at its own expense under an agreement that the material used should remain its property until full payment, with the right in case of default to remove the same and credit the power company on the contract with its scrap value. Subsequently, on the insolvency of the power company, a mortgage executed by it to secure bonds, and containing an after-acquired property clause, was foreclosed; the bill alleging, and the answer admitting, that the extensions in question were within the mortgage. The railway company claimed to be a large owner of the bonds, and, while not then a formal party, assisted in expediting the cause and in procuring an early decree for the sale of the property. It afterward became a party and consented to the appointment of a receiver and during all of that time asserted no right under its contract. *Held*, that it was estopped, or had waived its right, as against other bondholders, to enforce the contract by destroying the extension lines built thereunder, but that it might be allowed a preferred claim against the proceeds of the sale equal to the scrap value of the materials therein.

   [Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 257–259; Dec. Dig. ☞91.]

In Equity.   Suit by the State Bank of Chicago, trustee, against the Idaho-Oregon Light & Power Company and others.   On petition of intervention of the Idaho Railway, Light & Power Company and O. G. F. Markhus, its receiver.   Relief granted in part.

Cavanah, Blake & MacLane, of Boise, Idaho, for intervener.

E. E. Prussing, of Chicago, Ill., and Sullivan & Sullivan, of Boise, Idaho, for plaintiff.

Richards & Haga, of Boise, Idaho, for receiver of Idaho-Oregon Light & Power Co.

Joseph Cummins, of Chicago, Ill., for intervening bondholders.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

DIETRICH, District Judge. The principal suit was commenced in July, 1913, by the plaintiff, as trustee, to foreclose a trust deed given by the defendant Idaho-Oregon Light & Power Company (hereinafter called the "Power Company") upon all of its property, consisting of hydroelectric power plants, transmission lines, and distributing systems in Southwestern Idaho, by which it generated and distributed electric current for light and power purposes. Decree of foreclosure was entered during the following month, and thereafter, an immediate sale appearing to be impracticable, a receiver was appointed to take charge of and operate the property. The receivership commenced on December 10th, and still continues. On December 23, 1913, O. G. F. Markhus was appointed receiver of the property of the Idaho Railway, Light & Power Company (hereinafter called the "Railway Company"). On April 16, 1914, the Railway Company and its receiver were permitted to file a bill in intervention herein for the purpose of establishing their title to and their right to the possession of certain property in the possession of W. J. Ferris, receiver of the Power Company. In due time answers were filed by the plaintiff and the receiver for the Power Company, and also by A. W. Priest and others, intervening bondholders. Most of the facts are made to appear by the pleadings and a stipulation.

Two different claims are set up, one of which, however, presents no real controversy. It is for specific property loaned to the Power Company, and to which it asserts no right. As to this claim, therefore, an order or decree will go in favor of the interveners, substantially as prayed for, covering the articles listed in Schedule C attached to the bill in intervention as modified by the stipulation of facts.

The other claim is based upon what is referred to as an equipment trust agreement, copy of which is attached to the bill. This agreement is dated April, 1913, and is signed by the Railway Company, through its vice president, H. F. Dicke, and the Power Company, through its general manager, O. G. F. Markhus. Its execution, however, was not authorized by either the executive committee or the board of directors of either company. In terms it recites that both companies were engaged in the generation and sale of electric current in southwestern Idaho, and that the Railway Company was under contract to furnish current to the Power Company; that for adequate service to certain communities it was necessary for the defendant to make certain extensions of its transmission and distributing lines, but that it was without the necessary funds, and that the Railway Company was willing to furnish the material and make the extensions thereof, title to the material so furnished to remain in it until full payment should be made by the Power Company. It is alleged that in accordance with this agreement the Railway Company furnished material and made the extensions, at an actual cost of $56,187.91, no part of which, either principal or interest, has ever been repaid. The materials were furnished and the work was done during the period from April to September, 1913. It further appears that all of the equipment, consisting of poles, conductors, transformers, insulators, and other appliances, is in the possession of the receiver of the Power Company, and is being used by him, and that the same is necessary to enable the Power Company to

discharge its duties and obligations to the public in the transmission and distribution of electrical current. In the agreement it is provided that, in case of the default of the Power Company, the Railway Company may, at its option, have recourse to any one of several remedies, one of which is that it may "take possession of and remove any and all poles, conductors, transformers, insulators, and other appliances included within and sold under the terms of this agreement, applying the scrap value thereof on the amount due thereon, and take such steps to collect the balance as it may be advised or are available." This remedy it has elected to pursue, and accordingly by this proceeding it seeks an order directing the receiver to deliver over to its receiver possession of the equipment. There is an understanding that the present submission is only of certain preliminary questions, and therefore the evidence does not go to the extent of identifying the particular items of property in controversy, or of disclosing their value.

Several objections are urged to the relief sought. The first of these is that the equipment-trust agreement does not purport to cover all the property to which title is claimed. Apparently the point is well taken, but the question is not for present consideration. Such property, if any, as the Railway Company is entitled to reclaim, must be identified and shown to be within the terms of the agreement.

[1] The next objection is that the execution of the agreement was not authorized by either the Power Company or the Railway Company, and therefore it is not binding upon them. It is sufficient to say that if the agreement is valid at all it is valid for all purposes, and if it is void it confers no right upon the Power Company; in either view it could not operate to transfer title. The mortgagee is in no better position than the mortgagor; there are no distinct elements of estoppel in its favor. Such rights as it has rest upon the "afterwards-acquired" clause of the mortgage, but under this clause (with certain exceptions to be considered later), the mortgage lien attaches only to that which the mortgagor actually acquires.

[2] It is further urged that, inasmuch as the Railway Company owned practically all of the stock of the Power Company and dominated it, it would be inequitable to permit it to assert this claim to its own advantage and to the impairment of the security of the mortgagee. But inasmuch as the transaction was in good faith, and was fair, the mere fact that the Railway Company owned the stock of and controlled the Power Company does not debar it from the remedies available to other creditors having similar contracts.

It is also urged that the Railway Company expressly contracted to protect the mortgaged estate from claims that would impair the security of the mortgage. While there is some evidence in a general way tending to connect the Railway Company with such an agreement or understanding, it is insufficient to support a finding that it undertook at its own expense to install the equipment in question or any part thereof.

In the next place, it is argued that, if it be assumed that the agreement was legally executed, the reservation of title was ineffective because, with the intervener's consent, the property became impressed

with a public use, and was so attached that it became a part of the realty covered by the mortgage, and is an integral and necessary part of the plant of the Power Company, and necessary to keep it a going concern, and cannot be detached without injury to the public interest, and that therefore the lien of the prior mortgage attaches despite the attempted reservation of title. It is admitted that as a general rule conditional sale agreements are valid in Idaho. Barton v. Groseclose, 11 Idaho, 227, 81 Pac. 623; Kester v. Schuldt, 11 Idaho, 663, 85 Pac. 974; Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339. But it is argued that the authority of these cases extends only to "loose property susceptible of separate ownership and separate liens," and attention is drawn to Porter v. Pittsburg Bessemer Steel Co., 122 U. S. 267, 7 Sup. Ct. 1206, 30 L. Ed. 1210, where it is said that:

"It is well settled, in the decisions of this court, that rails and other articles which become affixed to and a part of a railroad covered by a prior mortgage will be held by the lien of such mortgage in favor of bona fide creditors, as against any contract between the furnisher of the property and the railroad company, containing stipulations like those in the contracts in the present case."

And to the same point the following cases are cited: Toledo, etc., R. R. Co. v. Hamilton, 134 U. S. 296, 10 Sup. Ct. 546, 33 L. Ed. 905; Phœnix Iron Works v. New York Security & Trust Co., 83 Fed. 757, 28 C. C. A. 76; Ryle v. Knowles Loom Works, 87 Fed. 976, 31 C. C. A. 340; Evans v. Kister, 92 Fed. 828, 35 C. C. A. 28; Guaranty Trust Co. v. City of Galveston, 107 Fed. 311, 46 C. C. A. 305; Gunderson v. Swarthout, 104 Wis. 186, 80 N. W. 465, 76 Am. St. Rep. 860; Fuller-Warren Co. v. Harter, 110 Wis. 80, 85 N. W. 698, 53 L. R. A. 603, 84 Am. St. Rep. 867.

While in a general way these cases tend to support the proposition, they are to be read in the light of the recent decisions of the Supreme Court in Holt v. Henley, 232 U. S. 637, 34 Sup. Ct. 459, 58 L. Ed. 767, and Detroit Steel Cooperage Co. v. Sistersville Brewing Co., 233 U. S. 712, 34 Sup. Ct. 753, 58 L. Ed. 1166 (decision rendered May 25, 1914), by which, to say the least, the application of the principle relied upon is confined to very narrow limits. And the evidence here is not sufficiently detailed or specific to enable us to determine what part, if any, of the property in question falls within those limits.

[3] In the last place, it is urged that the Railway Company, with full knowledge of all the facts, participated in the main case, and having procured and acquiesced in the entry of the decree therein, and having thereafter, up until the filing of this petition, made no objection to the treatment of the property as a part of the mortgaged estate, it must be deemed to have waived any right to the specific property which it may have had, and to have consented to the passing of the title thereto to the Power Company; and that it is bound by the decree, which describes the property and directs that it be sold, together with other property belonging to the Power Company, to satisfy the mortgage indebtedness. The facts upon which this defense is based should be briefly stated. In the complaint in the main case the plaintiff alleged, and in the answer of the Power Company, signed by it through its president, it admitted, that this property was owned by it. The de-

cree describes the property together with others, and directs .that it be sold to satisfy the mortgage indebtedness. It is further true that at all times herein referred to the Railway Company was in complete control of the Power Company, and dominated its affairs; it owned substantially all of its capital stock, and claimed to own a large portion of the bonds secured by the trust deed involved in the foreclosure. It and the interests by which it was controlled had a plan for the reorganization of the two companies, pursuant to which it was, through the foreclosure proceeding, to acquire all of the properties belonging to the Power Company. In some, if not in all, important particulars, the plaintiff deferred to its wishes and the wishes of those whose interests were allied with it touching the proceedings to be taken in the foreclosure suit. Over the objection of the intervening bondholders, it and those associated with it strenuously opposed delay in the entry of the decree, which, if not prepared by it, certainly had its approval. Shortly after the decree was entered, it formally came into the suit, and from time to time urged that all the property be sold. As a party to the suit it assented to the appointment of a receiver. At no time did it suggest its ownership, nor was any claim ever asserted by it or upon its behalf prior to the letter written by its receiver to the receiver of the Power Company on the 23d day of March, 1914. In opposing petitions of the intervening bondholders and others, it has uniformly insisted that the decree, having become final, cannot now be modified, and is binding upon all parties interested.

The first question is whether the facts are sufficient to constitute an estoppel of record. Doubtless there are conditions where one may be bound by a judgment, although he is not in name a party to the action. Tootle v. Coleman, 107 Fed. 41, 46 C. C. A. 132, 57 L. R. A. 120; James v. Germania Iron Co., 107 Fed. 597, 46 C. C. A. 476; Jefferson Electric Co. v. Westinghouse Electric Co., 139 Fed. 385, 71 C. C. A. 481; Litchfield v. Goodnow, 123 U. S. 549, 8 Sup. Ct. 210, 31 L. Ed. 199. The Railway Company's relation to the formal parties and its participation in the proceedings have been such that it must, I think, be deemed to have been a party in fact and is bound by the decree which it has actively aided in securing and maintaining. If it be said that in foreclosure suits issues of title are not ordinarily involved, the answer is that the objection to their consideration does· not go to the jurisdiction, and undoubtedly they may be entertained by consent of the parties, express or implied.

But if the view be adopted that, strictly speaking, estoppel of record is not established, there still remains for consideration the question whether the facts constitute an estoppel in pais, or charge the Railway Company with laches, or signify an intention upon its part to abandon its title and waive its right to retake the property. That in appointing a receiver and administering the estate the court acted upon the assumption of unconditional title in the Power Company is unquestioned, and apparently such was the belief of the mortgage trustee. It is not shown, and perhaps in the nature of things could not be shown, that the course of the trustee or the bondholders has been materially affected by such assumption, or that the policy of administration would have

been substantially different had the truth been known. The claim does, however, substantially affect the value of the mortgage security, and the question of the value of the insolvent estate has from time to time entered into the consideration of the time when, and the conditions upon which, a sale should be made. But if, for the reason that there is no direct proof of injury or prejudice to any party in interest, we reject the defense of strict estoppel, still should the claimant now be heard to assert a right to retake possession of the property? Its approval of and long acquiescence in the decree are not to be accounted for upon the theory of inadvertence or carelessness. The conclusion is unavoidable that it knowingly consented that this property should be included and sold as a part of the mortgaged estate; there is no other reasonable explanation of its conduct. Just what its purpose may have been we can only conjecture, but it must be borne in mind that, if its plan of reorganization had been consummated, as it doubtless expected would be the case, until a considerable length of time had elapsed after the entry of decree, the property would have come into its possession upon foreclosure sale, and there may have been reasons why it preferred to take title in that way.

I am reluctant to send the interveners away without any relief, and yet the question of what can properly be granted is a most perplexing one. As has been shown, there are objections both formal and substantial to awarding the Railway Company the title and possession of the property. Upon the other hand, for the Power Company to hold the property and pay nothing for it would seem to be harsh in the extreme. The contract price is doubtless greatly in excess of the present value of the property, and therefore to require the receiver of the Power Company to pay such price would be neither equitable to other creditors nor would it be warranted by well settled principles of law applicable to the administration of insolvent estates.

Upon the whole I have concluded the fairest solution of the problem would be to award the interveners, as a preference claim against the estate of the Power Company, the scrap value of the property. In so doing, the integrity of the decree will be preserved, the property will remain a part of the estate, in harmony with what was doubtless the purpose and intent of the Railway Company when the decree was entered, the amount which will thus be required of the estate of the Power Company will not be in excess of what in equity and good conscience it should pay, and the interveners will get in value substantially the relief which title and possession would now afford. As we have already seen, the contract provides that, in case the Railway Company retakes the property, it shall credit upon the contract price only the scrap value thereof. In a sense, therefore, this is the standard which the parties themselves have provided, and, while doubtless the scrap value is incommensurate with the purchase price, it is the full equivalent of what the interveners would have obtained had the receiver of the Power Company complied with their demand and turned over to them the property. For the difference between the scrap value and what is justly due upon the contract, the interveners will, of course, be recognized as having a general unpreferred claim against the estate of the Power Company.

In this view, it will be necessary to refer to a master the question what property falls within the equipment-trust agreement, and the further question of its scrap value. Possibly the several parties in interest can reach an agreement touching both these questions. An application will, however, be entertained at any time on the part of any one in interest for such reference and the appointment of a master.