TEXAS CO. v. INTERNATIONAL & G. N. RY. CO. et al.

(Circuit Court of Appeals, Fifth Circuit. March 15, 1918.)

No. 3090.

1. RECEIVERS ⊚⇒163—LABOR AND SUPPLIES—CLAIMS—INTEREST.
   Where receivers were appointed at the suit of second mortgage bond-holders, and the net income from the operation of the road by receivers would have been sufficient to have paid supply claimants, with interest had no payments been made on the first mortgage bonds and upon equipment, the supply claimants are entitled to payment, with interest.

2. SALES ⊚⇒85(1)—CONTRACTS—IMPLIED CONDITION.
   A contract to supply a railroad company with fuel oil contains no implied condition that it should be canceled in event a receiver is appointed for the company.

3. CONTRACTS ⊚⇒10(4)—MUTUALITY.
   Where a railroad company, which had contracted for the purchase of fuel oil, became insolvent, and receivers were appointed, the fact that the seller could not, after the company's default, be required to furnish oil without payment, does not destroy the mutuality in the contract, so as to prevent the seller from recovering for the breach.

4. RECEIVERS ⊚⇒90—RIGHTS OF—CONTINUATION OF CONTRACT.
   When a receiver is appointed, he has the right to confirm and carry out those contracts which are advantageous to the insolvent; hence such contracts continue, despite the receivership, for otherwise the receiver would not be given the option.

5. SALES ⊚⇒384(1)—BREACH OF SALE CONTRACT—DAMAGES.
   Where a railroad company, which had contracted for the purchase of fuel oil, went into the hands of a receiver, and the receiver canceled the oil contract, and thereafter bought from the seller oil at a less sum, the difference between the contract price and the price paid by the receiver cannot be accepted as fixing the measure of recovery for the breach, but it should be measured by the market value of the oil.

   Foster, District Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of Texas; Waller T. Burns, Judge.

Bill by the Central Trust Company of New York against the International & Great Northern Railway Company and others, in which the Texas Company intervened. From the decree on its intervening petition, intervener appeals. Reversed and remanded.

See, also, 237 Fed. 921, 150 C. C. A. 571.

Robert A. John, of Houston, Tex., and Amos L. Beaty, of New York City (T. J. Lawhon, of Houston, Tex., on the brief), for appellant.

William H. Wilson, H. M. Garwood, and Jesse Andrews, all of Houston, Tex. (Joline, Larkin & Rathbone, of New York City, and Baker, Botts, Parker & Garwood and Wilson, Dabney & King, all of Houston, Tex., on the brief), for appellees.

Before WALKER and BATTS, Circuit Judges, and FOSTER, District Judge.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

BATTS, Circuit Judge. The Central Trust Company of New York filed a bill August 7, 1914, against the International & Great Northern Railway Company, alleging that it was trustee under a mortgage dated August 1, 1911, to secure first refunding mortgage bonds, executed by the defendant in the amount of $14,791,000. It was alleged that these bonds were subject to outstanding bonds in the sum of $11,291,000, issued by the International & Great Northern Railroad Company, the predecessor of defendant in title to the railroad. In accordance with the prayer of the plaintiff, receivers were appointed.

The Texas Company filed a plea of intervention, alleging that on the 1st of January, 1914, it had entered into a contract with the defendant, whereby it agreed to sell and deliver to the railroad company. and the latter agreed to purchase and receive, a minimum of 1,350,000, or a maximum of 1,650,000, barrels of fuel oil, at the price of 95 cents per barrel. It was alleged that oil to the value of $225,778.52 had been furnished under this contract, for which intervener had not been paid; that there was undelivered upon the minimum amount 1,197,-034.22 barrels; that the receivers, after their appointment, declined to adopt the contract, and purchased oil at 67 cents per barrel, which was the market price; that defendant breached the contract, and, as a consequence, intervener had sold the oil covered by the contract at 67 cents; and that, by reason of the facts alleged, defendant became indebted to intervener in the further sum of $335,169.58.

The intervention was referred to a master, who found that within the period of six months beginning February 10, and ending August 10, 1914, the intervener furnished the defendants fuel oil and other material and supplies necessary for the conduct of the business of defendant railway company as a going concern, to the amount of $225,778.52, but that the total should be reduced, as the result of balancing claims and counterclaims, to $225,592.06. The master also found that the amount undelivered upon the minimum named in the contract was as alleged by intervener, and found that intervener had entered into a new contract with the receivers for the sale of oil at 67 cents per barrel, to apply to all deliveries after the receivership.

Upon the trial before the master it was agreed that the intervener's measure of damages would be the difference between the contract price and the market price of the oil at the date of the receivership, unless affected by the fact that the receivers contracted with the intervener for something like 700,000 barrels of oil at 67 cents. The master found that the weight of the evidence was to the effect that, for industrial and other purposes, fuel oil was worth about 75 cents, and that railroads usually got their oil under contracts for considerable quantities at from 2 to 5 cents per barrel less, unless the railroad contract ran over a period of two or three years, in which event the sellers of oil raised the price to provide against contingencies. He concluded that the Texas Company was damaged by the breach of the contract in the difference between 75 cents and 95 cents per barrel, aggregating $239,406.85. The master also found that the net surplus of operating income of defendant railway company from February, 1914, to August, 1914, in excess of its operating expenses, after deducting the surplus

for six months' period prior to receivership, was $1,324,173.84, according to reports of the company to the Railroad Commission of Texas, and he found that the net surplus, "being the difference between the gross income and operating expenses" for the period beginning February 1, 1914, and ending April 30, 1915, as shown by the books of the company, amounted to $609,235.85, this taking into account a deficit in income for the six-months period prior to the receivership of $81,575.80; the "net surplus" in the operation of the receivers for the months from August, 1914, to April, 1915, being $690,811.65. The report of the master allowed interest on the amount found to be due for supplies furnished within the six-months period from the 1st of January next following.

Exceptions to the report of the master were ruled upon, and a decree entered, wherein interveners were allowed interest from the date each payment on the contract became due. It was held that the corporation was insolvent at the time of the appointment of receivers and at the time of the decree, and that "interest accruing on the claim of the Texas Company since the appointment of receivers was entitled to no lien or preferential right of payment." Interveners were denied damages against the railway company for breach of contract.

[1] The contention of appellant that interest should be paid from the date of the receivership to the time of payment is based principally upon the case of American Iron & Steel Co. v. Seaboard Air Line, 233 U. S. 261, 34 Sup. Ct. 502, 58 L. Ed. 949. This case was referred to in the Pennsylvania Steel Co. Case, 216 Fed. 471, 132 C. C. A. 531, in a decision by the Circuit Court of Appeals, and this language used:

"The allowance of interest on these claims after the appointment of receivers was refused on the ground that the delay thereafter was that of the court, for which neither the debtor nor the other creditors of the debtor should suffer. In Thomas v. Railroad Co., 149 U. S. 95 [13 Sup. Ct. 824, 37 L. Ed. 663], this was said to be the general rule. In that case interest on a debt incurred during the receivership was refused, as against the mortgagee, out of the corpus of the estate. On the other hand, in Southern Ry. Co. v. Carnegie Steel Co., 176 U. S. 257 [20 Sup. Ct. 347, 44 L. Ed. 458], the court * * * did allow interest as against the mortgagee on the ground of a diversion of income. The point was raised in argument and was decided. We presume that the court did not intend to overrule its prior decision in Thomas v. Railroad Co., but found the particular case not to be within the general rule there laid down. As between creditors of the same class there would be no use in allowing interest out of a fund insufficient to pay all. In this case, however, the supply creditors are preferred, and the fund is sufficient to pay them in full, with interest, and leave a balance over for general creditors. We are disposed to think that the ground on which interest was allowed in the Southern Railway Case was that the mortgagee, having enjoyed the use of the diverted income, should restore it with interest. The opinion lately handed down by the Supreme Court in American Iron & Steel Mfg. Co. v. Seaboard Air Line Railway, 233 U. S. 261 [34 Sup. Ct. 502, 58 L. Ed. 949], sets the question at rest."

A finding of the master is to the effect that the income from the operation of the railway since the receivership would have been sufficient, after payment of operating expenses and taxes, to have paid the claim of intervener, and all other claims of like character, had no payment been made upon the first mortgage bonds, and upon equipment which go under the mortgages after the equipment liens are dis-

charged, and no expenditures made for betterments which improve the condition of the corpus of the railway company and enhance the value of the securities of the bondholders. This finding is amply sustained by the evidence, and it is apparent that, but for the payments indicated, there would have been sufficient to discharge the supply claims in full with interest.

Appellees contend that no case has gone to the point of holding that the supply claims may be discharged out of the corpus of the estate, and suggest that the income is included within their mortgage. The rule which secures payment for supplies necessary to the conduct of the business of the railway, furnished within the six months prior to the receivership, based upon the assumption of value to the property covered by the mortgage, would appear to properly include interest to the time of payment. Any payment which fails to take into consideration the delay, to that extent, gives the mortgagee the benefit of the use of another's money. The very condition which entitles the mortgagee to interest would suggest that interest be paid to any person who contributes to his security. The trial court held that at the time of the receivership the railway company was insolvent. This was doubtless the case; indeed, if it had not been insolvent, there would have been no occasion for the receivership. But it certainly is not the case that insolvency precludes the accrual of interest. In cases where the insolvent estate is insufficient to discharge the principal of the debts, and these debts are of the same class, there is, of course, no benefit to be derived to creditors by the calculation of interest which it is impossible for them to receive; but there can be no defensible rule which deprives creditors of compensation for delay in discharging that which is due them. The result of the receivership in the present case was an income sufficient to pay the intervener's supply claim and all other claims of like character, with interest, and the interest should be paid.

[2] The defendant, the International & Great Northern Railway Company, makes the proposition that the contract entered into between it and the Texas Company had an implied condition to the effect that if the railway company should become unable to perform its functions as a railway, in other words, if it should become insolvent, and its operations conducted by receivers, it would become thereby canceled. It is insisted that the same rule should apply to a contract of a railway company for supplies as to contracts for personal services, and some other contracts with reference to which this implied condition has been recognized by the courts. There is no reason why the classes of contracts to which this rule has been applied should be extended. No reason appears why, if a railroad contract is subject to be canceled by insolvency, the rule should not be universal.

[3] The defendant also insists that the contract has become canceled by the fact that, when the railroad company became insolvent, the oil company was not under obligations to furnish the oil, and that the necessity for mutuality, and the resulting absence of mutuality, destroyed the contract. It is the part, of course, of every continuing executory contract that the seller may, whenever the contract is breached by a failure of the purchaser to pay for the thing sold, decline to fur-

nish anything further under the terms of the contract. He is relieved from the contract by the breach on the part of the purchaser. The purchaser, however, is not relieved of the legal consequences of his breach by the assertion on the part of the seller of the rights which the general law of contracts gives to him. The reasoning of the defendant is substantially to the effect that any contractor, breaching the contract, is relieved of the consequences of his breach by the circumstance that the other party to the contract has the right to protect himself against such consequences. The intervener in this case does not seek to establish its claim for damages as a preferential claim, and it recognizes the validity of the liens which the bondholders have against the property. It may be that a judgment in its behalf will be without value. This is a frequent consequence of the accrual of rights against a person or corporation without property; but a creditor is entitled to an adjudication of his rights, even if no good comes to him from the adjudication.

[4, 5] Whenever a receiver is appointed, he has the right to confirm and carry out the contracts of the insolvent. If the effect of insolvency were to be the cancellation of such contracts, there would, of course, be no such right on the part of the receiver. The contracts continue. If it be one which is advantageous to the insolvent, the receiver has the right to treat it as an asset, and get the benefit of it for the creditors. If the contract is not an advantageous one, the receiver would exercise his right not to confirm it, and the person whose contract has thus been treated has the rights of a creditor. These rules, which are well established, are, of course, inconsistent with the claims that are being asserted by the defendant. When the receivers were appointed, they declined to adopt the contract between intervener and the defendant, and immediately thereafter entered into a contract with intervener to the effect that oil thereafter furnished would be at the price of 67 cents per barrel.

The intervener insists that, as to 700 barrels of oil furnished to the receiver at this price, it is entitled to receive the difference between the 67 cents received and the 95 cents contracted for, upon the ground that, whenever a contract for the sale of a thing is breached by the purchaser, the seller may make as advantageous a resale as possible, and hold the purchaser for the balance. We are inclined to think this rule not applicable to the facts in the present case. Oil is a product of very general consumption, for which there is a continuing market. The contract contemplated sales extending over a considerable period. There was nothing to indicate that the oil which was to be furnished under the contract was at the time even in existence. Its production, however, was continuous, just as was the market. No more reason appears for taking into consideration the sale of 700 barrels to the receivers than to consider the sale of the balance, some 500,000 barrels. It may be that this balance was sold at a price in excess of the contract price. It seems to us that too many elements of uncertainty are introduced, if we depart from the proposition that the rights of the seller are to be determined by the market price at the time of the breach of the contract.

The evidence with reference to the market price at that time is conflicting. Indeed, it appears that there were different market prices, based on the uses to which the oil would be placed and the time covered by the contract. The master took into consideration the onerous character of the contract, the obligation on the part of the intervener to establish definitely the amount of his damages, and the conflicting character of the testimony, and fixed the market price at the time of the receivership at 75 cents. No action on this was taken by the trial judge; but, under the circumstances, we think the conclusion of the master should be sustained.

In accordance with the views hereinbefore expressed, the case will be remanded, with instructions to allow, as a preferential claim, interest on the amount adjudged to have been due intervener for supplies furnished within the period of six months preceding the receivership, from the time of the receivership to the time of payment (in addition to the amount allowed by the decree from which the appeal is taken); and judgment shall be rendered for intervener against the defendant International & Great Northern Railway Company for the amount awarded by the master as damages for the breach of the contract, together with interest at the legal rate in Texas, from the date of the receivership.

Reversed and remanded.

FOSTER, District Judge, dissents.